UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

CIVIL ACTION NO. 08-179-DLB

MITCHELL WILLOUGHBY                                              PETITIONER

vs.              MEMORANDUM OPINION AND ORDER DENYING
                 PETITION FOR WRIT OF HABEAS CORPUS

THOMAS L. SIMPSON, Warden,
Kentucky State Penitentiary                              R E S P O N D E N T

*** *** *** ***

This matter is before the Court on the petition of Mitchell Willoughby, by counsel, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

On July 22, 1983, a state-court jury found Willoughby guilty of three counts of first-degree murder for the deaths of Joe Norman, Joey Durrum and Jacqueline Greene. The jury recommended that Willoughby be sentenced to death for the murder of Durrum and Greene, and to life imprisonment for the murder of Norman. On August 31, 1983, the Fayette Circuit Court followed the recommendation of the jury and imposed the sentence of death accordingly. Willoughby is presently imprisoned in the Kentucky State Penitentiary as a result of his conviction and sentence.

In this § 2254 petition, Willoughby contends that he is being held in violation of the Constitution of the United States because of constitutional errors that occurred during his trial. Willoughby is not arguing that he is actually innocent of the crimes of conviction. Rather, he argues that his constitutional rights were violated by juror misconduct, confusing

1

jury instructions, prosecutorial misconduct, and being deprived of effective assistance of counsel. For the following reasons, the Court will **deny** Willoughby's habeas petition.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Trial in Fayette Circuit Court

Willoughby, Leif Halvorsen and Susan Hutchens were indicted on March 7, 1983 by the Fayette County Grand Jury on three counts of murder and two counts of robbery in the first degree. Willoughby was also charged with being a persistent felony offender in the second degree, while Halvorsen and Hutchens were each charged with carrying a concealed weapon. Hutchens agreed to plead guilty to two counts of hindering prosecution, and subsequently testified at Willoughby and Halvorsen's joint trial before a jury in Fayette Circuit Court in the Commonwealth of Kentucky.

The Honorable Armand Angelucci, Fayette County Circuit Court Judge, presided over the trial. Willoughby was represented by Joe A. Jarrell, an attorney from the Fayette County Legal Aid office. The Kentucky Supreme Court has ably summarized the evidence presented at Willoughby's trial as follows:

> The bodies of Joe Norman and Joey Durrum were found on the side of the Brooklyn Bridge on the Jessamine-Mercer County line. The body of Jacqueline Greene was found in the Kentucky River below the bridge. Each of the victims had been shot to death. David Warner, who lived on the Jessamine County side of the Brooklyn Bridge, became suspicious when he noticed a light blue Ford van and a dark pickup truck lurking at various points around the bridge. At one point, the pickup truck parked on the bridge, a person got out of the passenger side, and Warner heard a big splash. Forty-five minutes later, Warner heard a noise that sounded like a car hitting a guardrail or a sign. He looked out to see the blue van and the pickup truck speeding off across the bridge toward Lexington. Warner called the police.

> When the police arrived, they found two of the victims on the side of the bridge, each bound with a blue-and-yellow rope that was attached to a heavy rock. The third victim was found in the river below the bridge, wrapped

in a sheet that was also bound with a blue-and-yellow rope and attached to a heavy rock. A traffic sign near the bridge had been knocked over by a vehicle. It had paint smears on it and broken glass lying at its base.

Officer William Foekele testified that around 1:30 p.m., on January 13, he was on Loudon Avenue in Lexington, looking for a car involved in another investigation, when he noticed a blue Ford van stopped at 215 Loudon Avenue. He wrote down the van's license number. On the following day, police learned that two of the victims had lived in the house at 215 Loudon Avenue. A truck belonging to the third victim was found parked at the house. When police entered, they found blood at various places in the house.

Upon learning that a blue Ford van was seen in the area where the bodies were discovered, Officer Foekele suspected that it was the same vehicle which he had seen near the house at 215 Loudon the day before. A registration check revealed that the van was registered to Halvorsen. Foekele then went to Halvorsen's home but saw no vehicles in the driveway. A neighbor indicated that two men and a woman had just left in a blue pickup truck and would probably return shortly. Police staked out all routes to the house, located and cornered the truck, and demanded that its occupants exit. The driver, Mitchell, jumped out immediately. Halvorsen, after hesitating, slid out of the passenger side. The officers found a .38–caliber revolver where he had been sitting. As the officers approached the truck, the woman, Susan Hutchens, threw her hands up and said, "The gun's in my purse." A 9–millimeter pistol was found sticking out of her purse.

A ballistics expert positively identified several of the projectiles recovered from the victims' bodies as having come from the revolver and semi-automatic pistol found in the truck. Two 9–millimeter shell casings were additionally recovered at 215 Loudon. Fingerprints from both Willoughby and Hutchens were found on the 9–millimeter pistol. Hutchens' fingerprints were found on the refrigerator at 215 Loudon as well.

Also recovered from 215 Loudon, by the police, was a plastic blue-and-yellow rope identical to that found tied around the victims' bodies. Paint samples taken from Halvorsen's van matched the paint smears found on the highway sign near the bridge. A comparison between pieces of glass taken from a broken headlight on Halvorsen's van and pieces of broken headlight recovered from the base of the highway sign proved them to have come from the same headlight. Lastly, blood samples from Halvorsen's van were positively identified as having come from one of the victims.

At trial, Hutchens testified that in December 1982, she and Willoughby moved into the house at 215 Loudon, and Willoughby was employed by the victim, Joe Norman, to help him remodel the house. Willoughby and

Hutchens moved out a month later when Norman refused to pay Willoughby for the work he had done.

Hutchens testified that on January 13 Willoughby and Halvorsen asked her to buy ammunition for their pistols. Later that day, she decided to go visit the victim, Jacqueline Greene, who lived at 215 Loudon with Joe Norman. When she arrived, Willoughby, Halvorsen, and Norman were standing in the driveway talking. Hutchens went into the house where Greene introduced her to the victim, Joey Durrum. Willoughby, Halvorsen, and Norman then came inside when "all of a sudden" the shooting began.

Hutchens put her hands over her face, covering her eyes. She heard numerous shots. When the shooting was over, she opened her eyes to see Willoughby and Halvorsen each wielding a pistol. Norman and Durrum had fallen to the floor. Hutchens then saw Willoughby shoot Greene twice more, since she was still alive. Willoughby and Halvorsen then screamed at Hutchens to begin picking up the shell casings while they dragged the bodies of the victims through the hallway to the back door where they were placed in the van. Later, Halvorsen left in the van, and Willoughby left in the truck to get rid of the bodies.

Willoughby testified at trial in his own behalf that on January 13 he and Halvorsen went to 215 Loudon to smoke marijuana with Joe Norman. He and Norman began arguing about a cold check that Norman had given to him, when Norman poked him in the chest and threatened him with a bayonet. Willoughby then reached for his gun and began shooting. He remembered shooting Norman two or three times but did not remember shooting the other victims.

In his statements, Willoughby took all of the blame for the shootings. Halvorsen did not testify during the guilt phase. The jury found both Willoughby and Halvorsen guilty of the three murder charges, and Halvorsen guilty of carrying a concealed weapon. The penalty phase then proceeded, after which the jury returned verdicts sentencing Halvorsen and Willoughby to life imprisonment for the murder of Norman and to death for the murders of Greene and Durrum.

*Halvorsen v. Commonwealth*, 730 S.W.2d 921, 922-23 (Ky. 1986). The trial court followed

the jury's recommendation and sentenced Willoughby to death for the murders of Green

and Durrum, and life imprisonment for the murder of Norman.

**B.** **State court procedural history**

**1.** **Willoughby's direct appeal to the Kentucky Supreme Court**

Willoughby appealed his conviction to the Kentucky Supreme Court, raising thirty assignments of error. The Kentucky Supreme Court consolidated Willoughby's appeal with his co-Defendant's, Leif Halvorsen, for consideration. After thoroughly reviewing the issues raised on appeal, the Supreme Court held that: (1) Willoughby's rights were not violated by the prosecutor's comments that the jury's sentencing decision was a "recommendation"; (2) the "combination" jury instruction did not deprive Willoughby of due process; (3) the "combination" jury instruction did not deprive Willoughby of his right to a unanimous verdict; (4) the trial court did not err in choosing not to give an instruction on wanton murder; (5) the prosecutor's comments during penalty-phase closing arguments were not improper; (6) Willoughby's counsel from Legal Aid was not constitutionally ineffective even though another attorney from Legal Aid represented Willoughby's co-defendant, Hutchens; (7) trial court did not err in admitting Willoughby's pretrial taped and oral confessions; (8) trial court did not err in failing to instruct on all mitigating factors. *Id.* at 923-28. Although the Kentucky Supreme Court did not offer its reasoning for denying Willoughby's other claims, the court did state: "We have reviewed the other assertions of error and are of the opinion none of them merits comment." *Id.* at 928.

Additionally, Willoughby and Halvorsen each asserted on direct appeal that the trial court gave confusing and misleading instructions on the defenses of extreme emotional disturbance and intoxication. The substance of their claims was nearly identical. However, the Kentucky Supreme Court apparently only addressed Halvorsen's claim. *Id.* at 926. The court held there was no proof to suggest Halvorsen acted under extreme emotional

disturbance, such that the trial court did not have to *sue sponte* give the instruction. *Id.* The court also concluded that jury was adequately instructed by the trial court on the defense of intoxication. *Id.*

The Kentucky Supreme Court ultimately affirmed Willoughby's conviction and sentence, and then denied rehearing on July 2, 1987. *Id.* On December 7, 1987, the United States Supreme Court denied Willoughby's petition for a writ of certiorari. *Willoughby v. Kentucky,* 484 U.S. 982 (1987).

### 2. Willoughby's state court post-conviction relief proceedings

On February 8, 1988, Willoughby filed a Motion to Vacate, Set Aside, or Correct Judgment pursuant to Kentucky Rule of Criminal Procedure 11.42. Willoughby's CR 11.42 Motion primarily asserted that he received ineffective assistance of trial counsel for ten reasons: (1) his counsel, employed by Legal Aid, had a conflict of interest with counsel for Willoughby's co-Defendants, who were also employed by Legal Aid; (2) counsel's unconscionably large caseload prevented him from adequately preparing for trial; (3) counsel inadequately argued the motion to suppress Willoughby's pre-trial confession; (4) counsel failed to review and object to defective jury instructions, and request favorable instructions; (5) counsel failed to investigate prior to trial; (6) counsel submitted inadequate or no pretrial motions; (7) counsel made multiple errors during voir dire; (8) counsel failed to make appropriate objections at trial; (9) counsel made multiple errors calling witnesses, questioning witnesses, and developing defense theories during the guilt phase; and (10) counsel failed to make appropriate objections during the penalty phase, and failed to request appropriate penalty-phase instructions.

In addition to challenging his counsel's performance, Willoughby's CR 11.42 Motion asserted his constitutional rights were violated in five other respects: (1) the jury considered improper factors during their sentencing deliberations in violation of Willoughby's Eighth and Fourteenth Amendment rights; (2) the grand jury and petit jury did not represent a fair cross-section of the community; (3) the prosecutor sought the death penalty against Willoughby in discriminatory and arbitrary fashion; (4) the death penalty is cruel and unusual punishment; and (5) the Kentucky Supreme Court erred in rejecting Willoughby's argument on direct appeal that his death sentence was disproportional to factually similar cases where defendants received lesser sentences.

The Commonwealth filed a response to Willoughby's CR 11.42 Motion on March 2, 1988, and an additional memorandum in opposition to the motion on August 10, 1988. The 11.42 Motion, however, sat pending as the Fayette Circuit Court considered other post-conviction motions filed by Willoughby. For example, Willoughby moved to disqualify newly elected Fayette Circuit Court Judge Rebecca Overstreet from considering his CR 11.42 Motion on the grounds that she could not be impartial and that she had personal knowledge of disputed evidentiary issues germane to his case.[1] Willoughby also moved to disqualify the entire Fayette County Commonwealth's Attorney's office from representing the Commonwealth during the CR 11.42 proceeding.[2] Additionally, significant time passed as Willoughby's counsel from the Department of Public Advocacy withdrew due to a perceived conflict of interest, and new counsel was obtained on Willoughby's behalf.

---

[1] Judge Overstreet granted the motion and transferred the action to Fayette Circuit Court, Second Division, by random draw.

[2] That motion was denied by the Fayette Circuit Court on December 15, 1993.

The new attorneys, David Bratt and Robert Brown, took some time to become familiar with the case. On October 24, 1995, the parties convened for a status conference to move the CR 11.42 motion toward a final hearing and adjudication. For the first time in open court, Willoughby's counsel made known that they had filed an *ex parte* motion that must be adjudicated before the CR 11.42 hearing could take place. The Commonwealth objected to the *ex parte* nature of the motion. The court sustained the objection, finding that argument from both sides on the motion was appropriate.

On January 10, 1997, Willoughby moved the court to provide funding for investigative and expert assistance – what was later revealed to be the subject of the previous *ex parte* motion. Willoughby sought this funding to bolster his claim that trial counsel was ineffective in failing to properly investigate the case, interview witnesses and consider experts that might have provided mitigating testimony. The Commonwealth responded that Willoughby failed to establish that the assistance was "reasonably necessary" pursuant to *Hicks v. Commonwealth*, 670 S.W.2d 837 (Ky. 1984), and that funding should be denied. On August 4, 1997, the Fayette Circuit Court denied Willoughby's motion, finding that funding for assistance was not "reasonably necessary" because Willoughby had already been provided an expert from the Department of Public Advocacy and that the request for an expert was based on pure speculation.

Thereafter, Willoughby and his co-Defendant filed a petition for a writ of prohibition with the Kentucky Court of Appeals precluding the trial court from hearing evidence on the CR 11.42 motion before funding was made available. That petition was transferred to the Kentucky Supreme Court for consideration. The Kentucky Supreme Court found that a writ of prohibition was not warranted because Willoughby could not demonstrate that he would

suffer irreparable injury if the Circuit Court continued with the evidentiary hearing without providing funding for investigatory and expert assistance. Instead, according to the Court, if Willoughby's CR 11.42 motion were denied, he could argue on appeal that the Circuit Court improperly denied funding.

On February 11, 1997, the Fayette Circuit Court held an evidentiary hearing on Willoughby's CR 11.42 motion. The hearing was limited to four issues: (1) whether counsel's case load was too great for him to adequately prepare for trial; (2) whether counsel adequately investigated the case, interviewed witnesses, or properly considered expert assistance; (3) whether counsel failed to properly advise Willoughby on whether or not he should testify during the guilt or penalty phase, and whether counsel failed to properly prepare him to testify; and (4) whether counsel failed to adequately discuss trial strategy with him. Willoughby called five witnesses in support of these issues: Mr. Joe Jarrell, his trial counsel; Mr. Steven Bright, an anti-death penalty advocate, law professor, and Director of the Southern Center for Human Rights; Mr. Jesse Willoughby and Mrs. Marsha Willoughby, Willoughby's parents; and Dr. Peter Schilling, a forensic psychologist.

On November 26, 2003, the Fayette Circuit Court issued a five-page order denying Willoughby's CR 11.42 motion. Willoughby filed a motion to alter, amend or vacate the judgment under Kentucky Criminal Rule 59.05 on December 8, 2003, asking the Court to consider additional evidence that was not introduced at the CR 11.42 hearing. Among the evidence attached to the CR 59.05 motion were Willoughby's school, military, mental health, and incarceration records. Willoughby argued that these documents should have been discovered by his counsel in preparation for the sentencing phase of his trial. On January 14, 2005, the Fayette Circuit Court denied Willoughby's CR 59.05 motion, holding

that the new evidence could have been discovered in advance of the CR 11.42 hearing and the evidence would not have otherwise resulted in a different adjudication of the CR 11.42 motion.

Willoughby appealed the trial court's denial of his 11.42 and 59.05 motions, raising six claims of error. In three of the claims, Willoughby argued his trial counsel provided ineffective assistance, and the trial court erred in holding to the contrary. Willoughby also argued that the trial court erred by considering each claim of ineffective assistance separately without also considering the cumulative impact of the alleged ineffective representation. In addition, Willoughby argued that the trial court erred in failing to provide adequate funding to investigate potential post-conviction claims, and in failing to hold a hearing on the additional witnesses and evidence discussed in his CR 59.05 motion.

On December 21, 2006, the Kentucky Supreme Court affirmed the trial court's ruling on Willoughby's 11.42 and 59.06 motions. *Willoughby v. Commonwealth*, No. 2005-SC-0115-MR, 2006 WL 3751392 (Ky. Dec. 21, 2006). The Court denied rehearing on May 24, 2007. *Id.* On November 26, 2007, the United States Supreme Court denied *certiorari*. *Willoughby v. Commonwealth*, 552 U.S. 1043 (2007).

While Willoughby's appeal from the trial court's ruling on his CR 11.42 and 59.05 motions were pending, Willoughby filed a motion for relief from final Judgment pursuant to Kentucky Criminal Rule 60.02(f) alleging juror misconduct. Willoughby asserted that a juror, Reverend Walter Garlington, had a Bible with him at all times while serving as a juror, read the Bible to the jury and lead the jury in prayer every day. In support of this motion, Willoughby attached an affidavit submitted by an investigator for his co-Defendant, Halvorsen. That affidavit affirmed that the investigator interviewed Garlington, and he

admitted to reading the Bible to the jury and leading the jury in prayer. Willoughby asserted that Garlington's conduct constituted a violation of his Sixth Amendment right to an impartial jury, the First Amendment's prohibition against the establishment of religion, and the Eighth Amendment's prohibition against cruel and unusual punishment. Willoughby moved the trial court to hold an evidentiary hearing to develop his claim and also sought leave of court to interview the jurors.

The Commonwealth responded to Willoughby's CR 60.02 motion on August 2, 2005. In its response, the Commonwealth argued that Willoughby's motion was untimely as it was brought twenty-one years after the final judgment was entered, and eight months after Willoughby's counsel learned the results of the investigator's interview with Reverend Garlington. Additionally, the Commonwealth contested Willoughby's assertion that Garlington's alleged conduct amounted to misconduct, and argued there was no evidence to suggest that the Bible influenced the jury's decision in any way. To this point, the Commonwealth contended that the affidavit in support of Willoughby's motion – an affidavit of Halvorsen's investigator – contained inaccurate hearsay testimony that should not be considered.

On August 3, 2005, the trial court held a hearing on Willoughby's CR 60.02 motion and granted the parties additional time to file supplemental briefing. After the supplemental briefing was filed, the trial court issued its decision on December 5, 2005 denying Willoughby's motion. According to the court, Willoughby failed to file his motion within a reasonable time such that it could not be considered under CR 60.02(f). The court also held that the motion was without merit as there was no evidence in the record to support the possibility that the jurors were subject to any outside influence. Even if the jurors chose

to pray during their deliberations, the court found that to be no reason to inquire into the juror's discussions.

Willoughby appealed the trial court's denial of his CR 60.02 motion. On August 23, 2007, the Kentucky Supreme Court affirmed the trial court's decision, finding no abuse of discretion in ruling that the motions were untimely filed. The Court noted that Willoughby filed his motion over twenty years after his trial and nearly twenty years after the Court affirmed his conviction on direct appeal. This delay, the Court held, was "clearly prima facie evidence to support the trial court's conclusion that . . . Willoughby's motion[ ] [was] not, in fact, filed within a reasonable time." *Willoughby v. Commonwealth*, Nos. 2006-SC-000071-MR, 2006-SC-000100-MR, 2007 WL 2404461, at * 3 (Ky. Aug. 23, 2007). Because the Court agreed that the motion was untimely filed, the Court did not consider the merits of the motion. The Kentucky Supreme Court denied rehearing on August 21, 2008. *Id.*

## C. Federal court procedural history

On May 23, 2008, Willoughby, by counsel, filed his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. # 7). In that petition, Willoughby raised six (6) claims, including:

Claim 1:    The jury committed misconduct when it considered the Bible during deliberations

Claim 2:    Petitioner was denied his due process of law and his right to a fair trial when the trial court gave confusing and misleading instructions of petitioner's "defenses" of extreme emotional disturbance and intoxication

Claim 3:    The court below erred to petitioner's substantial prejudice and denied petitioner due process of law when it permitted the prosecutor, during the guilt phase, to make improper and prejudicial comments during closing argument

Claim 4:     Repeated emphasis that the jury's sentence was only a recommendation denied petitioner a fair trial and sentencing phase

Claim 5:     The repeated misconduct of the prosecutor during his penalty phase closing argument denied petitioner due process of law and a fair sentencing hearing

Claim 6:     Ineffective assistance of counsel at sentencing phase of the trial

The Commonwealth filed its answer on January 29, 2009. (Doc. # 12). Within the answer, the Commonwealth moved the Court to dismiss the petition with prejudice or, alternatively, for summary judgment. Willoughby filed his reply and response to the motion to dismiss or, alternatively, motion for summary judgment on April 29, 2009. (Doc. # 21).

Once the petition was fully briefed, Willoughby filed a motion to expand the record to include additional evidence in support of his claim that his counsel was ineffective during the sentencing phase. (Doc. # 23). At his CR 11.42 hearing, Willoughby primarily relied on the testimony of Dr. Peter Schilling to support these claims. Once the trial court denied his CR 11.42 motion, Willoughby attempted to give the trial court additional evidence to support these claims by submitting records that Dr. Schilling allegedly reviewed in preparation for his testimony. In the motion to expand the record filed in this Court, Willoughby sought to include an affidavit from Dr. Peter Schilling, which stated that he relied on each of the records that were attached to Willoughby's CR 59.05 motion in preparation for his testimony. Willoughby also attached the records to Dr. Schilling's affidavit.

On July 30, 2009, the Court denied without prejudice Willoughby's motion to expand the record as well the Commonwealth's motion to dismiss the petition. (Doc. # 26). At that time, the Commonwealth had not filed a complete and accurate copy of Willoughby's state-court proceeding in the record. Because a review of the state court record was essential

13

to adjudicating both motions, the Court denied both motions without prejudice, and gave the parties the option to resubmit their motions once the record was correct and complete.

Once the complete state court record was filed, Willoughby filed a renewed motion to expand the record. (Doc. # 29). Likewise, the Commonwealth submitted a second motion to dismiss the petition. (Doc. # 31). On October 5, 2009, Willoughby filed another motion to expand the record. (Doc. # 35). By that motion, Willoughby sought to include the results of the juror interviews conducted in 1985 in support of his claim of jury misconduct.

Ultimately, the Court denied both of Willoughby's motions to expand the record. (Docs. # 55, 57). The Court also denied the Commonwealth's motion to dismiss, finding, in part, that a motion to dismiss "would place unnecessary pressures on judicial resources in light of the extensive record which must be reviewed in such cases, present unintended burdens in light of the requirements of 28 U.S.C. § 476 under the Civil Justice Reform Act, and is premature until such time as the Court has resolved requests for discovery or for an evidentiary hearing which commonly occur at the outset of such proceedings." (Doc. # 55 at 4-5).

## II. STANDARD OF REVIEW

Federal courts are vested the authority to grant habeas relief for persons in state custody pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010)(internal citations omitted). This deferential standard is only required when the state court has adjudicated the claim on the merits. "[W]hen a claim has not been adjudicated on the merits in state court proceedings, and has not been procedurally defaulted, [the court must] look at the claim de novo rather than through the deferential lens of AEDPA." *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)(internal citations omitted). The Warden obviously seeks to have the Court apply a broad definition of "adjudicated on the merits," while Willoughby attempts to limit the definition, thereby escaping § 2254(d) review in favor of the more stringent standard of *de novo* review.

Willoughby posits that a claim has only been adjudicated on the merits if the last state court to consider it issued a "reasoned" opinion resolving the claim in its entirety, leaving no element of the applicable legal test unaddressed. Willoughby contends that an opinion is "reasoned" only when the state court offers some explanation for its decision; more specifically, explaining *how* and *why* it reached a certain conclusion. If the last state court to address the claim merely adopted a lower court's decision, or if the court simply stated that it resolved the claim on its merits without offering any explanation, Willoughby suggests that the claim has not been adjudicated on the merits for purposes of § 2254(d) review. If

there is any doubt as to whether the claim, or a portion of the claim, was adjudicated on the merits by the state court, Willoughby believes the federal habeas court must presume it was <u>not</u> adjudicated on its merits, and conduct a *de novo* review.

### 1. "Adjudicated on the merits"

The Supreme Court has recently clarified the meaning of "adjudicated on the merits" under AEDPA, and rejected many of Willoughby's attempts to limit the meaning of the phrase. In *Harrington v. Richter*, the Supreme Court held that, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be *presumed* that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles." 131 S.Ct. 770, 784-85 (2011)(emphasis added). This presumption applies even when the state court summarily rejects all of the claims without explaining its reasoning, or rejects a claim on one element without analyzing other elements. *Id.* at 784. The *Harrington* Court reached this conclusion based on the statutory language of § 2254, which requires only an "adjudication" of a "claim," and not each component of the claim. *Id.*

The Supreme Court recently extended the presumption of adjudication on the merits to instances where the state court rules against the defendant, and issues an opinion that addresses some claims but does not expressly address the federal claims. *Johnson v. Williams*, 133 S.Ct. 1088 (2013). The Court recognized that state courts do not always separately address each claim presented in a defendant's papers, though the state court did adjudicate each claim on its merits. *Id.* at 1094. In some instances, state precedent fully incorporates federal constitutional rights, and the state court may regard its discussion of state law as sufficient to cover the related federal claim. *Id.* at 1094-95. In other instances,

the state court might find that a fleeting reference to a provision of the federal constitution fails to sufficiently raise a separate federal claim. *Id.* at 1095. And on other occasions, the state court might conclude that a federal claim is too insubstantial to merit discussion. *Id.* at 1095-96. Although the state court does not offer specific analysis on the federal claim in each of these scenarios, the Supreme Court instructs that the "federal habeas court *must* presume that the federal claim was adjudicated on the merits . . . ." *Id.* (emphasis added).

The *Richter* presumption is a "strong one" that may be rebutted by the habeas petitioner only "in unusual circumstances." *Id.* The petitioner must show there is some other reason to believe the state court failed to specifically address a federal claim. *Richter*, 131 S.Ct. at 785. In considering whether the petition has satisfied this burden, the Supreme Court has provided a non-exhaustive list of factors for the federal habeas court to consider: state-court opinion-writing practices; discussion of state-law precedents and whether they incorporate federal law; substantiality of the federal claim; citations to federal cases in state-court opinions (or citations to state cases that contain citations to federal cases); and the degree of similarity between the federal and state claim. *Johnson*,133 S.Ct. at 1099-1100 (Scalia, J., dissenting).

### 2. Section 2254(d) deference

If a claim has been adjudicated on the merits by the state court, federal habeas relief may not be granted "unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the Supreme Court], § 2254(d)(1); or that it 'involved an unreasonable application of such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Richter*, 131 S.Ct. at 785 (internal citations omitted).

## A.    Contrary to clearly established federal law

A state-court decision is "contrary to" clearly established precedent "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).   The state-court decision must be measured against the clear holdings of the Supreme Court, as opposed to dicta, that existed at the time the state court rendered its decision.   *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011); *Williams*, 529 U.S. at 412.   Habeas relief is not warranted if the state-court decision erroneously applies Circuit Court precedent, including decisions of the Circuit Court that have interpreted Supreme Court precedent.   *Renico v. Lett*, 559 U.S. 766, 778 (2010).

## B.    Unreasonable application of clearly established federal law

The "unreasonable application" analysis often overlaps with the "contrary to" analysis. *Williams*, 529 U.S. at 385.   To the extent they differ, "[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme Court's] decision but *unreasonably* applies that principle to the facts of [the] petitioner's case.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)) (emphasis added).   "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).   To be entitled to habeas relief, "[t]he state court's application of clearly established law must [have been] objectively unreasonable." *Id.*   The Supreme Court has also defined the test as "whether it is possible fairminded jurists could disagree that [the

state court's decision is] inconsistent with the holding in a prior decision of th[e] [Supreme Court]." *Harrington*, 131 S.Ct. at 786.  If fairminded jurists could disagree, habeas relief is not warranted.  *Id.*

In evaluating a state-court decision under this prong, the federal habeas court must be mindful of the specificity of the Supreme Court's rule.  *Id.*  "'The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2011)).  Ultimately, the state-court decision must be granted deference and latitude under this standard.  *Id.*

### C.    Unreasonable determination of facts

Under § 2254(d)(2), federal habeas relief is warranted only if the state court made "an unreasonable determination of facts in light of the evidence presented in the State court proceeding."  *Rice v. Collins*, 546 U.S. 333, 338 (2006) (*quoting* 28 U.S.C. § 2254(d)(2)). The state court's factual findings are presumed correct; the habeas petitioner has the burden of rebutting this presumption by clear and convincing evidence.  *Id.* (citing § 2254(e)).  As the statutory language makes clear, the habeas petitioner may only use evidence presented in the state court to show the factual findings were unreasonable.  *Id.* at 339.

An unreasonable determination of fact alone by the state court, however, does not entitle the petitioner to habeas relief.  *See Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). "[The petitioner must [also] show that the resulting state court decision was "based on" that unreasonable determination" before habeas relief is warranted.  *Id.*

### III.  AEDPA DOES NOT VIOLATE THE SEPARATION OF POWERS

In an effort to escape the deferential review required by § 2254(d), Willoughby

contends that the statute is unconstitutional, though he does not offer any independent argument in support of his assertion. Instead, he relies exclusively on Judge Reinhardt's dissenting opinion from the Ninth Circuit's decision to deny rehearing *en banc* in *Crater v. Galaza*, 508 F.3d 1261 (9th Cir. 2007). Judge Reinhardt opined that § 2254(d), as AEDPA, amounts to a severely pervasive congressional incursion on the judicial power, in violation of the separation of powers doctrine. *Id.* at 1261. As it is a dissenting opinion, it has no precedential value in the Ninth Circuit and carries even less weight here.

Neither the Supreme Court nor the Sixth Circuit have addressed the constitutionality of § 2254(d) as amended by the AEDPA. When other circuits have considered the statute's constitutionality, they have uniformly upheld the law. *See Bonomelli v. Dinwiddie*, 339 F. App'x 384 (10th Cir. 2010); *Evans v. Thompson*, 518 F.3d 1 (1st Cir. 2008), *cert. denied*, 129 S.Ct. 255 (2008); *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007); *Mueller v. Angelone*, 181 F.3d 557 (4th Cir. 1999); *Green v. French*, 143 F.3d 865 (4th Cir. 1998), *overruled on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000); *Lindh v. Murphy*, 96 F.3d 856 (7th Cir. 1996), *rev'd on other grounds*, 521 U.S. 320 (1997). *But see Davis v. Straub*, 430 F.3d 281, 296-98 (6th Cir. 2005) (Merritt, J., dissenting). Willoughby's citation to Judge Reinhardt's dissent does not persuade this Court to disregard solid agreement among the circuits.

Judge Reinhardt opined that § 2254(d)(1) infringes on the federal judicial power – vested wholly and exclusively in the federal courts by Article III of the Constitution – in two principal ways. *Crater*, 508 F.3d at 1261. First, federal courts are required to analyze state-court decisions for conformity with only Supreme Court precedent, which prohibits lower courts from applying the ordinary principle of *stare decisis*, "thereby interfering with the

federal courts' normal adjudicatory process." *Id.* Second, federal courts are "required to give effect to incorrect state rulings that, in the federal courts' judgment, violate the Constitution." *Id.* These restrictions, Judge Reinhardt explained, amount to "a congressional breach of the federal judiciary's integrity and independence, of its duty to maintain the supremacy of the Constitution, and, indeed, of the constitutional structure itself . . . ." *Id.*

In *Bowling v. Parker*, 882 F. Supp. 2d 891 (2012), Judge Thapar, United States District Court Judge for the Eastern District of Kentucky, recently refuted arguments similar to those made by Judge Reinhardt, and found that § 2254(d)(1) did not violate the separation of powers. The court began with two important and related basic tenants of our federal system. First, state courts are capable interpreters of federal constitutional law, and are bound by the Supremacy Clause to "'guard and protect rights secured by the Constitution.'" *Id.* at 896 (*quoting Ex Parte Royall*, 117 U.S. 241, 251 (1886)). Second, lower federal courts derive their entire jurisdiction from statute, not Article III, and Congress is permitted to "expand or contract lower federal courts' power to grant habeas relief to state prisoners as it pleases." *Id.* at 897. The court then turned directly to whether § 2254(d) runs afoul of Article III.

Judge Thapar concluded that § 2254(d) does not violate Article III as it does not infringe on federal courts' independent judgment to determine whether a prisoner's constitutional rights were violated. *Id.* at 899. Rather, the statute serves to limit the information federal habeas courts may consider in exercising independent judgment, as well as limit the availability of the remedy. *Id.* More particularly, federal courts remain free to determine that a prisoner's right has been violated, however the court may only grant

habeas relief in limited circumstances. *Id.* Each of these limitations are constitutional in Judge Thapar's determination. *Id.*

"[T]he Necessary and Proper Clause of Article I grants Congress the power to 'make laws for carrying into execution all judgments which the judicial department has power to pronounce.'" *Id.* at 898 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 22 (1825) (Marshall, C.J.)). This clause allows Congress to limit the source of information that courts may consider in making its independent judgment, and also allows Congress to prescribe standards of review that courts must follow. *Id.* That same clause permits Congress to determine *when* a remedy is available for a violation of a constitutional right, though Congress may not dictate *how* courts interpret federal law nor compel a particular result. *Id.* at 899. Based on these considerations, Judge Thapar succinctly concluded that,

> [u]nder § 2254(d)(1), federal courts still make independent determinations of whether a petitioner's rights were violated, then look to Supreme Court precedent to decide whether they can grant relief. The statute limits remedies rather than mandating a rule of decision. As a result, § 2254(d)(1) does not run afoul of Article III.

*Id.*

Judge Thapar's well-reasoned conclusion in *Bowling* is consistent with all other circuits to consider the issue. As the Fourth Circuit held in *Green v. French*,

> In amending section 2254(d)(1), Congress has simply adopted a choice of law rule that prospectively governs classes of habeas cases; it has not subjected final judgments to revision, nor has it dictated the judiciary's interpretation of governing law and mandated a particular result in any pending case. And amended section 2254(d) does not limit any inferior federal court's independent interpretive authority to determine the meaning of federal law in any Article III case or controversy. Under the AEDPA, we are free, if we choose, to decide whether a habeas petitioner's conviction and sentence violate any constitutional rights. Section 2254(d) only places an additional restriction upon the scope of the habeas remedy in certain circumstances. As the Seventh Circuit pointed out in Lindh in great detail,

> such a limitation upon the scope of a remedy is entirely ordinary and
> unexceptionable, even when the remedy is one for constitutional rights. See
> *Lindh*, 96 F.3d at 870-73. Moreover, even if section 2254(d) does limit the
> interpretive power of the lower federal courts in some sense, that limitation
> is tantamount to other such choice of law limitations which are widely
> accepted and have never been thought to raise Article III problems. *See
> Lindh* at 870-73 (discussing non-constitutional contexts-such as res judicata,
> *Erie*, and federal court certification of state law issues-where federal courts
> are often bound by another tribunal's interpretation of law).

*Green v. French*, 143 F.3d 865, 874-75 (4th Cir. 1998) (internal citations omitted), *rev'd on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000). This Court agrees with Judge Thapar and all other circuits to decide the issue. Section 2254(d)(1) does not infringe on the court's independent judgment to determine whether a constitutional violation has occurred, but instead limits the court's ability to provide a remedy. This limitation does not breach the judiciary's independence. Ultimately, § 2254(d)(1) is constitutional, and Willoughby's claims will be reviewed pursuant to the statute where it applies.

## IV. ANALYSIS

### Claim 1– Juror Misconduct

As his first ground for habeas relief, Willoughby argues that the jury committed misconduct by considering passages from the Bible during its deliberations, violating his Sixth and Fourteenth Amendment right to trial by an impartial jury and a verdict based solely on the evidence presented at trial. The Warden responds that habeas relief is not warranted on this claim because it is procedurally defaulted, and Willoughby cannot establish cause and prejudice to excuse the default. The Court agrees; this claim is procedurally defaulted and Willoughby has not established sufficient cause to excuse the default.

## A.    Applicable Law

"'"Under the procedural default doctrine, a federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision."'" *Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011)(*quoting Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004)).   A federal habeas court can, however, consider the claim on its merits if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."   *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The Sixth Circuit uses a four-part test to determine whether a claim is procedurally defaulted:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule . . . .    Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . .    Third, the court must decide whether the state procedural ground is an adequate and independent ground on which the state can rely to foreclose review of a federal constitutional claim . . . .    Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then petitioner must demonstrate . . . that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Stone*, 644 F.3d at 346 (*quoting Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).   In making this inquiry, the court is to "look at the last explained state court judgment to determine whether relief is barred on procedural grounds."   *Id.*   (internal quotations and citations omitted).

**B.    This claim is procedurally defaulted**

Willoughby conceded in his petition that this claim is procedurally defaulted, and that he must establish cause and prejudice in order for the Court to consider this claim on its merits. Having reviewed each of the first three factors, the Court finds that concession to be appropriate. Willoughby brought this claim in state court pursuant to Civil Rule 60.02(f) on June 27, 2005. Under that rule, a trial court may amend or correct its prior judgment for "any other reason of an extraordinary nature justifying relief" so long as the motion is filed within a "reasonable time" after the judgment was entered. CR 60.02(f). The trial court has the discretion to determine whether the motion was filed within a reasonable time. *Gross v. Commonwealth*, 648 S.W.2d 853, 858 (Ky. 1983). Here, Willoughby's CR 60.02 motion was filed twenty-one years, ten months, and twenty-two days after his judgment was entered.

The Kentucky Supreme Court held that the trial court did not abuse its discretion in determining that Willoughby failed to file his CR 60.02 motion within a reasonable time. *Willoughby v. Commonwealth*, Nos. 2006-SC-000071-MR, 2006-SC-000100-MR, 2007 WL 2404461, at *1 (Ky. Aug. 23, 2007). The Court explained that Willoughby's CR 60.02 was "filed over twenty over twenty years after the trial . . . [and] [t]hat protracted delay is clearly prima facie evidence to support the trial court's conclusion that . . . Willoughby's motion[ ] [was] not, in fact, filed within a reasonable time." *Id.* at *2.

The Court also rejected Willoughby's contention that he filed the motion as soon as he learned of potential impropriety. According to the Court,

> It is uncontested that the trial court gave permission for the jurors to be interviewed in 1985. At that time, many of the jurors refused to be interviewed; but two jurors were actually interviewed. And Juror Garlington's

25

strong religious views surfaced during the trial, as is plainly evident from the astonishing fact that the trial court allowed Garlington to lead the courtroom in prayer at the conclusion of the case. So through due diligence and proper questioning, Halvorsen and Willoughby could have learned of any alleged jury misconduct approximately twenty years before they filed their CR 60.02 motion. Indeed, since they had already had an opportunity to speak to at least two jurors, it appears as if Halvorsen and Willoughby could have, and should have, included any claims regarding jury misconduct in their RCr 11.42 petitions. Investigator Gentry's affidavit states that his interview with Juror Garlington occurred before the trial court denied Willoughby's RCr 11.42 petition. So Willoughby presumably could have, at a minimum, sought leave to amend his RCr 11.42 petition to reflect the jury misconduct allegations stemming from Gentry's affidavit. Issues that could reasonably have been made in an RCr 11.42 motion are not cognizable in a CR 60.02 motion filed later in time.

*Id.* Based on the length of delay in filing his motion, as well as Willoughby's failure to discover the issue in a timely fashion, the Kentucky Supreme Court affirmed the trial court's decision to deny the requested relief under CR 60.02. *Id.* at *3.

The Kentucky Supreme Court's decision to deny Willoughby's CR 60.02 because it was untimely filed amounted to an adequate basis for its judgment and was independent of the federal question. A discretionary state procedural rule, such as the discretion to determine whether a CR 60.02 motion was filed within a reasonable time, may satisfy the "adequate" requirement so long as it is "firmly established and regularly followed." *Walker v. Martin*, 131 S.Ct. 1120, 1127-28 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009)). As the Kentucky Supreme Court noted in its decision affirming the trial court's denial of Willoughby's CR. 60.02 motion, similar motions filed far sooner than Willoughby's are often denied because they were not filed in a reasonable time. *Willoughby,* 2007 WL 2404461, at *3 (citing *Gross v. Commonwealth*, 648 S.W.2d 853, 858 (Ky. 1983) (holding that trial court did not abuse its discretion in finding that CR 60.02 motion filed five years after conviction was not filed in reasonable time); *Reyna v. Commonwealth*, 217 S.W.3d

274, 276 (Ky. App. 2007) (holding that CR 60.02 motion filed four years after guilty plea was not filed in reasonable time)); *see also Stoker v. Commonwealth*, 289 S.W.3d 592, 597 (Ky. App. 2009) (CR.02 motion filed eighteen years after conviction was not filed in reasonable time); *Commonwealth v. Carneal*, 274 S.W.3d 420, 433 (Ky. 2008) (finding no abuse of discretion in trial court's decision to deny CR. 60.02 motion as untimely when it was filed six years after judgment was entered). The state court's reliance on this discretionary rule, thus, appears firmly established and regularly followed, such that the state court's decision rested on an adequate basis independent of the federal question. As a result, Willoughby's claim is procedurally defaulted unless he can establish cause and prejudice.

### C. Willoughby has not established cause for his procedural default

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The prisoner may demonstrate such an objective impediment by showing, among other things, "that the factual or legal basis for a claim was not reasonably available to counsel" or "that some interference by officials made compliance impracticable." *Id.* Willoughby asserts he was prevented from developing the merits of this claim because jurors refused to be interviewed after trial, and those that were interviewed were otherwise recalcitrant. This argument is unavailing. Willoughby had the opportunity to develop the merits of this claim much sooner, but failed to do so.

Willoughby asserts that he had no reason to know about Reverend Garlington's alleged misconduct until 2003 when Garlington was interviewed by the DPA investigator.

However, a review of the trial transcript shows that Willoughby had notice that religion *might* have influenced Garlington's decision. During voir dire, Garlington revealed that he was formerly a pastor at a Baptist Church. (TE 366). In light of his profession, Garlington was asked if he had ever debated against the death penalty based on his religious beliefs. Garlington responded:

> The Bible says if you live by the sword you'll die by the sword. Now the Bible also says that if a man – no man can take his life but Christ. Now if a man hasn't been saved, he's already committed himself. If a man is saved, then it doesn't matter, because he's with the Lord. Now if a man has done accepted Christ and he does wrong, he should be judged by the system. You follow what I'm saying.

(TE 367). Garlington went on to explain:

> If he done wrong, then he should pay. As far as the death penalty, that's him and the federal government or whatever the case may be; if he's done wrong and he's found guilty and the facts prove it, then I have to vote that man gets the penalty, whatever it is.

(*Id.*).

Garlington expressed his religious views in open court for a second time when he was permitted to lead the court in prayer at the conclusion of trial. Garlington stated:

> Let's all just bow our heads. Just for a moment for truly we all have been through a trying situation and we can see from our standpoint that justice has been done, and we want to say to you, *we want to say to God that we appreciate him coming into our midst and guiding us all.* We want to thank God for this.

(TE 2621) (emphasis added). These comments clearly demonstrated Garlington's views on the death penalty were driven, in part, by his religious beliefs. They also revealed his belief that God guided the court, and jury, in bringing justice against Willoughby.

In 1985, the trial court permitted Willoughby to interview the jurors. Eleven of the jurors were contacted, but nine of the jurors refused to be interviewed; two jurors, Shirley

Munro and an unidentified juror, were interviewed. According to Willoughby's petition, both jurors were asked general questions about the atmosphere of juror deliberations. Neither juror indicated that religion played a part in their decision. Willoughby admits, though, that neither juror was specifically asked about religion, even after all of Garlington's comments about religion in open court. By all accounts, it appears that both jurors were honest and forthcoming based on the questions asked. With proper questioning, Willoughby could have uncovered potential juror misconduct during those interviews, if juror misconduct occurred at all. As a result, juror recalcitrance was not the cause of Willoughby's failure to discover this issue sooner. Rather, it was his own failure to properly question those jurors who agreed to be interviewed. This cannot serve as cause to excuse Willoughby's defaulted claim.

### D. Willoughby is not entitled to an evidentiary hearing to establish cause

In his petition, Willoughby also requests the Court hold an evidentiary hearing so that he may establish cause for his procedural default. Willoughby proposes that he would call Juror Munro and the unidentified juror who were interviewed in 1985 to establish "whether or not in 1985 [he] had the ability to plead this claim." (Doc. # 7 at 42). Willoughby's co-Defendant previously moved the Court for an evidentiary hearing on the same grounds, which was denied. *See Halvorsen v. Parker*, Civ. A. No. 08-cv-484-DLB, 2012 WL 5866595 (E.D. Ky. Nov. 19, 2012). The Court will deny Willoughby's informal motion on the same basis.

Federal habeas courts are permitted to exercise their discretion in considering whether to hold an evidentiary hearing for a prisoner to establish cause and prejudice to excuse a procedurally defaulted claim. See *Schriro v. Landrigan*, 550 U.S. 465, 474

(2007). In exercising this discretion, the court may consider whether the state-court record refutes the prisoner's factual allegations or otherwise precludes habeas relief. *Schriro v. Id.*; *see also* Rules Governing § 2254 Cases, Rule 8 ("If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any material submitted under Rule 7 to determine whether an evidentiary hearing is warranted.").

Having reviewed the state-court record, Willoughby has failed to specify what *new* information could be discovered by questioning these jurors at an evidentiary hearing. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (holding that district court did not err in denying request for evidentiary hearing where prisoner failed to specify what could be discovered through an evidentiary hearing). Willoughby's state-court record gives the Court sufficient notice that he attempted to interview all of the jurors in 1985, and that nine jurors refused to be interviewed. The record also clearly shows that two jurors agreed to be interviewed, but did not mention during their interviews that Garlington engaged in any improprieties during deliberations. Finally, as Willoughby readily admits, he did not specifically ask the jurors whether religion impacted their decision. Thus, the Court is well aware that Willoughby failed to discover the alleged juror misconduct during the 1985 interviews for a combination of reasons. Willoughby's desire to call those two jurors to testify about facts that are already in the record would not aid the Court in determining whether sufficient cause has been established. Willoughby's motion for an evidentiary hearing is, therefore, denied.

### Claim 2 – Jury Instructions

Willoughby argues that the trial court's instructions on the applicability of the extreme

emotional disturbance and intoxication defenses were confusing and misleading, which deprived him of due process of law. Willoughby presented this challenge to the Kentucky Supreme Court. The parties, however, disagree about whether the Kentucky Supreme Court addressed the claim on the merits such that § 2254 deference is warranted here. This Court need not resolve that issue because Petitioner's claim lacks merit even if it is given *de novo* review.

### A.    Instructions on Extreme Emotional Disturbance

Willoughby was charged with three counts of murder for the deaths of Joe Norman, Joe Durrum and Jacqueline Green. Willoughby's confession and other evidence presented at trial clearly indicated that he shot and killed Norman. However, Willoughby's mental state at the time he killed Norman was disputed. Therefore, the trial court instructed the jury on the elements of murder (Instruction No. 22), first degree manslaughter (Instruction No. 23), second degree manslaughter (Instruction No. 24), and reckless manslaughter (Instruction No. 24) for the death of Norman. As part of the murder instruction, the court instructed the jury that they must find Willoughby was *not* acting under extreme emotional disturbance ("EED") when he killed Norman in order to return a guilty verdict for murder. The jury ultimately found Willoughby guilty of murdering Norman, which necessarily included the finding that he was not acting under EED.

While the evidence clearly showed that Willoughby shot and killed Norman, it was not clear whether Willoughby or his co-defendant killed Durrum and Green. Both defendants fired shots at the victims, however the evidence was disputed as to whose shot ultimately caused the victims' death. As a result, the trial court instructed the jury that they could find Willoughby guilty of murder as to Durrum and Green under either a principal,

accomplice or "combination" instruction.  The "combination" instruction stated:

> If you believe from the evidence beyond a reasonable doubt that the defendant Mitchell Willoughby under one or the other of [the principal or accomplice instructions], but are unable to determine whether he acted as a principal or accomplice in the murder of Joe Durrum, you will Mitchell Willoughby guilty under this instruction . . .

(Instruction No. 28).[3]  The jury ultimately found Willoughby guilty under the "combination" instruction for the murders of Durrum and Greene.

Neither the accomplice or combination instruction explicitly mentioned that the jury must find Willoughby was not acting under EED in order to return a guilty verdict. Willoughby argues that this ambiguity or omission deprived him of the benefit of the EED defense and, therefore, deprived him of due process of law.  The Warden responds that a later, specific instruction on the applicability of EED adequately instructed the jury on the defense.  Alternatively, the Warden asserts that any error was harmless because the jury found Willoughby was not acting under EED when it found him guilty of murder as to Norman.  The Court agrees with each of the Warden's arguments.

When a habeas petitioner challenges jury instructions as ambiguous, as Willoughby has alleged here, the Court must ask "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (*quoting Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  It is not enough that the instruction is "undesirable, erroneous, or even universally condemned. " *Cupp,* 414 U.S. at 416.  Likewise, "not every ambiguity . . . in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  Instead, the Court

---

[3] The "combination" instruction (No. 36) as to Count Three – murder of Jacqueline Greene – is identical to Instruction No. 28, aside from replacing Durrum's name with Greene's.

must consider "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle*, 502 U.S. at 72 (internal citations and quotations omitted). This, in turn, generally requires a showing that the guarantees enumerated in the Bill of Rights has been violated by the jury's verdict. *Dowling v. United States*, 493 U.S. 342, 352 (1990).

In making this determination, the Court must not consider any of the instructions in isolation; rather, each instruction must be reviewed in the context of the overall charge. *Cupp*, 414 U.S. at 146; *Jones v. United States*, 527 U.S. 373, 391 (1999). An instruction that might appear ambiguous when read in isolation may be cured when read in conjunction with other instructions. *Jones*, 527 U.S. at 391; *Bryan v. United States*, 524 U.S. 184, 199 (1998).

Here, Willoughby asserts that the jury instructions were confusing on the applicability of the EED defense. A defendant is deprived of his right to due process if he is prevented from having the jury instructed on a defense so long as the evidence supports the defense. *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002). This issue, then, turns on whether the jury applied the instructions in a way that deprived Willoughby of the right to have his EED defense considered. When the instructions are considered in full, as they must be, the jury was adequately advised of the applicability of the EED defense.

Instruction No. 42 specifically addressed the EED defense and cured any ambiguities that might have otherwise been created. The instruction stated, in part:

> And, if you believe from the evidence beyond a reasonable doubt that the defendant Mitchell Willoughby would be guilty of murder under Instruction 26, 27, or 28 [i.e., the principal, accomplice or combination instruction], except you have a reasonable doubt as to whether at the time he killed Joe Durrum (if he did so) he was acting under the influence of extreme emotional

33

disturbance for which there was a reasonable explanation or excuse under the circumstances as he believed them to be, *you shall not find him guilty of murder, but shall find him guilty of first degree manslaughter under Instruction No. 29* . . . .

(emphasis added). The instruction was repeated with respect to the murder of Jacqueline Greene. As this instruction clearly shows, the jury was properly advised that they could only find Willoughby guilty of first degree manslaughter if they believed he was acting under EED when he killed or was complicit in the murder of Durrum and Greene. The Court presumes that the jury followed the instructions in returning a guilty verdict of murder on Counts 2 and 3. *See, e.g., Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."). Thus, the jury did not apply the instructions in a way that deprived Willoughby of his right to have the EED defense considered.

Assuming *arguendo* that the instructions as they relate to EED did violate Willoughby's due process rights – although the Court is certain they did not – the error was harmless. By finding Willoughby guilty of murdering Joe Norman under Instruction No. 22 – the principal actor instruction – the jury specifically found that Willoughby was not acting under EED. Durrum and Greene were murdered at the same time Willoughby killed Norman. Hence, Willoughby's mental state at the time he killed Norman was the same as his mental state when he either killed or was complicit in killing Durum and Green. Therefore, even if the jury was instructed as Willoughby wishes they were, the jury would have certainly concluded that he was not acting under EED at the time Durrum and Greene were murdered. Any perceived error in the instructions was, therefore, harmless.

## B.    Instructions on intoxication

Willoughby also argues the trial court's instructions were confusing and misleading

on the applicability of the intoxication defense, which deprived him of the opportunity for the jury to meaningfully consider his defense. Willoughby's concern is that the jury was never explicitly told which charges they *could* find him guilty of even if they found he was intoxicated. For example, in the murder instructions relying on a principal liability theory, the jury was told they could *not* convict Willoughby of murder if they found he was intoxicated. Willoughby claims the jury should have been instructed, for example, that if they found him guilty of murder, but also concluded that he killed the victims while intoxicated, the jury must return a guilty verdict to second-degree manslaughter rather than intentional murder. To be clear, Willoughby does not assert that the instructions incorrectly stated Kentucky law; rather, he contends the instructions were confusing or misleading.

Reviewing the instructions in full, as the Court must do, the Court concludes that Willoughby was not deprived of the opportunity to have the jury consider his intoxication defense. The jury was explicitly, and correctly, instructed that they could not find Willoughby guilty of intentional murder or first-degree manslaughter if they concluded that Willoughby was intoxicated. *See Fields v. Commonwealth*, 12 S.W.3d 275, 282-82 (Ky. 2000) (recognizing that voluntary intoxication may negate the mens rea element of intentional murder and first-degree manslaughter). Because the jury was instructed on voluntary intoxication as a defense to these offenses, the jury was also appropriately instructed on second-degree manslaughter as a lesser included offense. *See id.* (holding that it is prejudicial error, under Kentucky law, to not instruct the jury on second-degree manslaughter as a lesser included offense of murder and first-degree manslaughter if the jury is instructed on the intoxication defense). Consistent with Kentucky law, the principal liability second-degree manslaughter instructions did not mention intoxication. It is

reasonable to infer that by omitting any reference to the intoxication defense, the jury would conclude that the defense was not available to that crime. As such, the jury was adequately instructed on Willoughby's intoxication defense. Ultimately, while the jury instructions might have been undesirable to Willoughby, it is not likely that the jury applied the instructions in a way that deprived him of the right to have his intoxication defense considered.[4]

### Claim 3 – Prosecutorial Misconduct During Guilt-Phase Closing Arguments

As his third ground for a writ of habeas corpus, Willoughby contends that the prosecutor made various improper comments during guilt-phase closing arguments,

---

[4] The Kentucky Supreme Court considered this same argument when it was raised by Willoughby's co-defendant, Leif Halvorsen, on direct appeal. The Kentucky Supreme Court held as follows:

> Halvorsen also complains that while the court properly included his defense of intoxication in those instructions under which he was entitled to such a defense, he was denied the benefit of the defense by the failure of the court to specifically refer the jury to the offenses which it could convict him of if it found him to have been intoxicated.

> The instructions under which the intoxication defense was available were clearly set out by language spelling out the elements of the defense. It is a reasonable inference that the instructions which excluded such specific language also excluded the defense. As such, the jury was free to convict Halvorsen under these instructions had it been so inclined to accept his intoxication defense, and no additional Instructions were necessary to impress the jury that these offenses were alternatively available had it accepted Halvorsen's intoxication claim. There is no merit to these assertions of error.

*Halvorsen v. Commonwealth*, 730 S.W.2d 921, 926 (Ky. 1986).

The Warden argues that the Supreme Court also decided this issue as to Willoughby, and this Court must therefore review the Kentucky Supreme Court's decision under § 2254. It is unclear whether the Supreme Court decided this issue as to Willoughby, thereby triggering § 2254 deference. Nonetheless, the Court finds that the Kentucky Supreme Court appropriately applied federal law, even upon *de novo* review.

causing substantial prejudice and deprived him of a fair trial. First, Willoughby argues that the prosecutor improperly discussed the robbery charges even though they had already been dismissed by directed verdict. Second, Willoughby asserts that the prosecutor alluded to other, uncharged crimes committed by Willoughby. Third, Willoughby contends the prosecutor created the perception that other incriminating evidence existed, but was not allowed to be presented to the jury. Finally, Willoughby argues the prosecutor gave unsworn expert testimony during his argument.

## A.     State Court Decision

Willoughby presented this claim to the Kentucky Supreme Court on his direct appeal. The Kentucky Supreme Court did not offer a specific analysis of this claim in its opinion affirming Willoughby's conviction. Instead, the court summarily denied the claim on its merits, stating: "We have reviewed the other assertions of error and are of the opinion none of them merits comment." *Halvorsen v. Commonwealth*, 730 S.W.2d 921, 928 (Ky. 1986). Pursuant to the United States Supreme Court's recent decisions in *Johnson v. Williams*, 133 S.Ct. 1088 (2013), the Court presumes that this claim has been adjudicated on the merits. In fact, this claim appears to be the type the *Johnson* Court described as "too insubstantial to merit discussion" by the state court. *See id.* at 1095 ("[T]here are instances in which a state court may simply regard a claim as too insubstantial to merit discussion."). Despite the Kentucky Supreme Court's decision to forego discussing its decision, because the prosecutorial misconduct  claim was presented and summarily denied, this Court is required to give a strong, but rebuttable, presumption that the claim has been adjudicated on the merits.

Having reviewed the entirety of the Kentucky Supreme Court's decision on Willoughby's direct appeal, the presumption of adjudication on the merits is appropriate for this claim. In addressing Willoughby's separate prosecutorial misconduct claim during the sentencing phase, the Kentucky Supreme Court held that there was overwhelming evidence against Willoughby and his co-defendant, including their own admissions. *Halvorsen*, 730 S.W.2d at 925. As the Sixth Circuit has held, "[o]verwhelming evidence of guilt can oftentimes be sufficient to sustain a conviction despite some prosecutorial misconduct . . . ." *Bates v. Bell*, 402 F.3d 635, 648-49 (Ky. 2005). It appears that the Kentucky Supreme Court's finding of overwhelming evidence of guilt supported its conclusion that the prosecutorial-misconduct-during-guilt-phase claim was entirely devoid of merit and, therefore, did not deserve comment. In short, there is nothing to suggest the Kentucky Supreme Court simply overlooked Willoughby's claim; it was adjudicated on the merits and is entitled to deferential review under § 2254(d).

### B.    Applicable Law

In order to prevail on habeas review, Willoughby must establish that the prosecutor's comments deprived him of due process of law. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 546 (1974)). "In making this determination, [the Court] must bear in mind that 'the touchstone of the due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (*quoting Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993)). Remarks that "were undesirable or even universally condemned," *Darden*, 477 U.S. at 181,

do not rise to a due process violation unless "'the conduct was so egregious so as to render the entire trial fundamentally unfair.'" *Byrd*, 209 F.3d at 529 (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.), *cert. denied*, 522 U.S. 1001 (1997)).   Ultimately, the prosecutorial misconduct must be of "extreme nature" for a federal court to issue a writ. *Id.*

This due process analysis is guided by a two-part test.  *Moore v. Mitchell*, 708 F.3d 760, 799 (6th Cir. 2013).  The Court first considers whether the comments were improper. *Id.* If they were, the Court considers four factors to determine whether the comments were flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally made, and (4) the total strength of the evidence against the defendant."  *Id.* (*quoting Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005)).  Additionally, because the Kentucky Supreme Court adjudicated this claim on its merits, the Court must give deference to the state court's decision.  *Id.*; *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2005) ("Claims of prosecutorial misconduct are reviewed deferentially on habeas review.").

### C.    Comment on Robbery Charges

Although the trial court dismissed the robbery charges against Willoughby at the conclusion of the Commonwealth's case-in-chief, the prosecutor discussed the robbery charges and evidence in support thereof during his closing argument.  Willoughby argues that this discussion was improper and flagrant, and deprived him of a fair trial.  Although the prosecutor's comments might be improper when considered in isolation, the comments were not improper when reviewed within the context of the trial as a whole.  *See United*

*States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004) ("In examining prosecutorial misconduct, it is necessary to examine the statements at issue within the context of the entire record.").

Along with three murder charges, Willoughby and his co-defendant were originally charged with two counts of robbery in the first degree. At trial, the Commonwealth principally relied on the testimony of Hutchens – who pled guilty to two counts of hindering prosecution prior to trial – to support the robbery charge. Hutchens testified that she was sitting in the livingroom talking with Jackie Greene when the shooting started. (TR 1745). Hutchens covered her eyes until the shooting stopped. (*Id.*). When she uncovered her eyes, she saw Jackie Greene and Joe Durrum lying on the ground. (TR 1746). Hutchens stood, walked toward Jackie Greene and stood over her as Greene began to moan. (*Id.*). Hutchens said, "Jackie's crying," prompting Willoughby to walk toward Greene and shoot her twice more. When the shooting ceased, Hutchens went through Greene's purse and took her wallet, and stole some jewelry from a jewelry box inside the house. Hutchens also searched Durrum's pockets and took something out, although she was unable to recall what she took.

At the conclusion of the Commonwealth's case-in-chief, Willoughby and his co-defendant moved for a directed verdict on the robbery charge. They argued, *inter alia*, that the Commonwealth's proof established that Hutchens took the property *after* the victims were deceased. Under Kentucky law, they asserted, one cannot be guilty of robbery in the first degree for taking property from a corpse. The trial court agreed and dismissed the robbery charges.

Counsel for Willoughby's co-defendant brought up the robbery charge during his closing argument, stating as follows:

> Well now when we started this case, there were six charges presented to you that were going to be proven beyond all doubt. Ladies and gentlemen, you heard the Judge say that he'd dismissed two of those charged, because there just wasn't evidence to substantiate it. They're gone. They not only cannot be proven to you beyond all doubt, they didn't even meet the first standard. *Does that, therefore, mean you need to ask a question about the rest of the charges?*

(TR 2239-40) (emphasis added).

During its closing argument, the Commonwealth responded to counsel's rhetorical question that the jury must doubt the integrity of the entire case. Specifically, the prosecutor stated:

> Since Mr. Maloney brought it up, I want to mention about the robbery charge, which is no longer before you, because he implied to you or suggested to you that because I said that we would prove this robbery beyond any doubt and that isn't before you, that somehow you've got to question this entire case. Well ladies and gentlemen, I told you that the case would be proven to you because it would be shown that the defendants took the personal property of the victims and they did, and when I say they I – I include these defendants and I include Susan Hutchens, who's a defendant in this case, although not here today, and they did take it.

> Well, in some of these legal things that go on in the court – in the court proceeding, the Judge decides – decided that that is not robbery, because it wasn't proven that that happed before they were killed as opposed to after they were killed. We may have a difference of opinion, but that's not the point. The point is that it was proven to you the facts. It was proven to you that they took the property and that was proven to you beyond all doubt. Now if there is a discrepancy about the law of robbery, it really isn't relevant to whether or not this case of murder is proven to you beyond any doubt.

(TR 2256-57).

When considered in context, the prosecutor's statements were not improper. "The prosecution necessarily has 'wide latitude' during closing argument to respond to the

defense's strategies, evidence and argument." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (quoting *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008)). "How far the government may go . . . depends on what the defense has said or done . . . ." *Id.* (internal citations omitted)*; see also United States v. Beverly*, 369 F.3d 516, 543-44 (6th Cir. 2002). Here, the prosecutor's comments were clearly in direct response to defense counsel's assertion that the jury must doubt the Commonwealth's *entire* case because the robbery charges were dismissed. The prosecutor explained that it set forth proof to establish some, but not all of the elements of robbery as determined by the trial court – an accurate statement. More importantly, the prosecutor clarified that whether the defendants were guilty of robbery was entirely irrelevant to whether they were guilty of murder – another accurate statement. These comments went no further than necessary to respond to defense counsel's closing argument; these comments were, therefore, not improper.

The prosecutor's discussion of the robbery charge was also not flagrant even if it were determined to be improper. It is nearly impossible that these comments misled or confused the jury. If anything, the prosecutor's comments actually clarified for the jury that the robbery and murder charges were factually and legally distinct. The comments were isolated to the Commonwealth's closing argument and limited in scope. And they undoubtedly had little impact on the jury's verdict given the strength of the evidence, which included eye-witness testimony that Willoughby shot Jackie Greene, as well as Willoughby's own admission that he shot Joe Durrum. As such, the Kentucky Supreme Court did not unreasonably apply clearly established federal law in concluding that these comments did not deprive Willoughby of a fair trial.

**D.    Other Crimes**

Willoughby also argues that the prosecutor improperly discussed two crimes unrelated to those charged in the indictment during closing argument, depriving him of a fair trial.  Willoughby challenges two statements in particular.  First, near the outset of his closing argument, the prosecutor discussed Willoughby's intoxication defense, including Willoughby's own admission that he used drugs extensively in the days preceding the murders.  The prosecutor stated, "You can't even [use drugs] legally.  To what extent did they have to go to come up with drugs to do it?"  Willoughby argues that this rhetorical question was an attempt to have the jury conclude that he was "out committing unspecified crimes in order to have a defense" to the murders which he had yet to commit.  (Doc. # 7 at 51).

Second, Willoughby challenges the prosecutor's comments about a weapon seized from Willoughby's person the day he was arrested. The prosecutor stated:

> Mitchell Willoughby when he's arrested the next day with this 9 millimeter, with these nicely cleaned notches in the butt of his gun and ask yourself what kind of person has a gun with notches on it.

In his habeas petition, Willoughby points out that four notches were etched into the gun, yet he was standing trial for three murders.  Willoughby asserts that prosecutor's emphasis on the notches improperly suggested that he had committed a fourth murder.[5]  Each comment will be addressed in turn.

The prosecutor's discussion of Willoughby's drug use was not improper; rather, it was fair comment on Willoughby's testimony.  In support of his defense of intoxication,

---

[5] After Willoughby's trial in Fayette Circuit Court, he pled guilty to one count of murder in Estill County, Kentucky.

Willoughby testified extensively about his drug and alcohol use.  Specifically, he testified that he used Demerol, Morphine, Meperidine, Dilaudids, cocaine, Percodan, Tuinal, acid, marijuana, Tuissionex, LSD and other drugs during the month prior to the murders. Willoughby also testified that he purchased or received drugs from Joe Norman and Leif Halvorsen, as well as other "dope dealers." (TE 1922).  In fact, Willoughby testified that he carried a gun with him because some of the dealers were "pretty shady characters."  (*Id.*).

During his closing argument, Willoughby's counsel asked the jury to consider his intoxicated state at the time of the murders.  Counsel listed many of the drugs Willoughby admitted to using, and explained that Willoughby increased his drug usage about a week before the murders.  Counsel also suggested to the jury that at the time of the murders, "Mitchell was not a normal person.  He was a zombie.  The Mitchell Willoughby you see today is not the Mitchell Willoughby then.  He's dried out.  The drugs and alcohol have left his system.  It's the old Jekyll and Hyde."  (TE 2225).

The prosecutor's comments were fair comment on Willoughby's testimony and trial strategy.  *See Bedford,* 567 F.3d at 233 (holding that prosecution is allowed to respond to defense's strategies and evidence).  The prosecutor's statement that "[y]ou can't even [use drugs] legally" was a proper comment on Willoughby own admission that he took significant amount of illegal drugs, including cocaine, LSD and acid.  Likewise, the prosecutor's rhetorical question – "To what extent did they have to go to come up with drugs to do it?" – asked the jury to consider Willoughby's testimony about how he acquired drugs, which included bartering with people like Joe Durrum and purchasing from "shady" "dope dealers."   Because these comments were directly supported by Willoughby's own admission that he engaged in unlawful activity to support his drug habit, the comments

were not improper.

The prosecutor's comment on the murder weapon also does not entitle Willoughby to habeas relief. Willoughby contends that the prosecutor's comment improperly suggested he killed a fourth person. However, the prosecutor never mentioned the number of notches on the gun, nor was there testimony or argument that the number of notches was commensurate with a particular number of murders. Moreover, the Commonwealth was careful to never mention that Willoughby was being investigated for a fourth murder. Under these circumstances, the prosecutor's passing mention of the notches on the murder weapon could not have misled the jury to believe Willoughby committed a fourth murder, nor, given the strength of evidence against Willoughby, is there anything to suggest that but for these comments, the outcome of the trial would have been different. *See Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) ("This court must decide whether the prosecutor's statements likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt.").

### E. Trial by Innuendo

Willoughby argues that the prosecutor implied to the jury during closing argument that they were prevented from hearing other available incriminating evidence during trial. Relying on the Kentucky Supreme Court's decision in *Moore v. Commonwealth*, 634 S.W.2d 426, 438 (Ky. 1982), Willoughby contends that these comments were improper and violated his right to a fair trial because they had the effect of trying him by innuendo. However, Willoughby's argument entirely ignores the context of the prosecutor's arguments. When the challenged comments are considered in the context of the prosecutor's entire closing argument, it is obvious that the prosecutor did not suggest there

was other incriminating evidence available to the Commonwealth that they were prevented from presenting.  *See United States v. Wells*, 623 F.3d 332, 338 (6th Cir. 2010) (holding that prosecutor's comments must be considered in proper context to determine whether they were likely to mislead the jury).

Willoughby challenges two particular comments made by the prosecutor.  First, Willoughby challenges the prosecutor's statement that, "[w]e gave you all the proof that there was, all the proof that is that we could – that we could give to you."  However, this statement was made at the end of the prosecutor's attempt to explain why the Commonwealth presented evidence that might have appeared irrelevant prior to Willoughby taking the stand in his own defense and admitting to many facts at issue.  The prosecutor stated:

> We put on a lot of proof in this case, a lot of it which now Mr. Jarrell can call window dressing, because it may not seem necessary in light of the fact that Mitchell Willoughby has now testified and given us some additional insight into what went on.  But we didn't rely on that happening; We didn't figure he was going to do that; We didn't know what he was going to say.  So we gave you all the proof that there was, all the proof that is that we could – that we could give to you.

(TE 2254).  As the prosecutor's own words make clear, there was no suggestion that there was other incriminating evidence that the jury did not hear.  Rather, the prosecutor explained why the jury heard additional incriminating evidence from the defendant, and why the Commonwealth did not present that evidence during its case-in-chief.  This statement could not have misled the jury to believe there was *other* incriminating evidence it did not get to hear; therefore, this statement did not deprive Willoughby of a fair trial.

Willoughby also challenges the prosecutor's discussion of the testimony of Detective Robert Stephens, who recounted two out-of-court statements made by Willoughby.  After

his arrest, Willoughby made two statements to Detective Stephens that contained repeated references to his co-defendant, Leif Halvorsen. During trial, the Detective was permitted to testify about Willoughby's statements under Kentucky Rule of Evidence 801A because they were being offered as statements against a party opponent and, thus, not hearsay. However, pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), the Detective was not allowed to testify about any portions of Willoughby's statements that referred to his co-defendant so as not to violate Halvorsen's rights under the Confrontation Clause.

Unbeknownst to the Commonwealth during its case-in-chief, Willoughby decided to testify during his own case. During the Commonwealth's cross examination, the prosecutor asked Willoughby about the statements he made to Detective Stephens. Then, during Halvorsen's cross examination of Willoughby, his counsel also questioned Willoughby about the statements. Pursuant to *Bruton*, once Halvorsen's counsel had the opportunity to cross-examine Willoughby on his statements, the entire statements were permitted to be introduced into evidence, including any portion that incriminated Halvorsen. *See Nelson v. O'Neil*, 402 U.S. 622, 626 (1971) ("It was clear in Bruton that the 'confrontation' guaranteed by the Sixth and Fourteenth Amendments is confrontation at trial – that is, that the absence of the defendant at the time the codefendant allegedly made the out-of-court statement is immaterial, so long as the declarant can be cross-examined on the witness stand at trial.").

During the Commonwealth's closing argument, the prosecutor attempted to explain to the jury why only portions of Willoughby's statements were introduced during its case-in-chief, and why the remaining portions were introduced at a later time. Specifically, the prosecutor stated:

Well let's look back at Saturday, the 15th. You have heard large portions of the audio of those statements and before I move on, I want to mention one thing. You might have wondered why when Detective Stephens testified about the statements Mitchell Willoughby made to him, he left out of those statements all references to Leif Halvorsen. And then later when you heard portions of those statements played, it was clear that the defendant was referring to Leif Halvorsen being with him at Loudon Avenue. It simply is a legal point, ladies and gentlemen, is that up until a point that a defendant testifies and can be cross-examined by the co-defendant's attorney, Mr. Maloney, we can't introduce statements that Mitchell Willoughby said which might have involved Leif Halvorsen. It wouldn't be fair to Leif Halvorsen, because we couldn't cross-examine the maker of the statement until Mitchell Willoughby testified and then he could, and that — at that point it became reasonable to bring in all of those statements of Mitchell Willoughby. So that's a little legal point which I'm sure you didn't–weren't aware of; nobody was until about ten years ago, including the Supreme Court of the United States.

(TE 2274). Willoughby contends that this statement somehow suggested that there was additional incriminating evidence that was withheld from the jury.

Contrary to Willoughby's contention, the prosecutor never suggested that there was additional evidence the jury did not get to hear. Instead, the prosecutor plainly explained to the jury why they did not hear the entire statements during the Commonwealth's case-in-chief, but had to wait until after Willoughby testified. Willoughby's argument asks the Court to read some prejudicial ambiguity into a statement that is plain and clear on its face. Even if there were two plausible interpretations of the prosecutor's statement, the Sixth Circuit instructs courts to "not strive to adopt the one which casts doubt upon the prosecutor's intentions." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). Where a statement is clear, as is the one at issue here, the Court will certainly not create an ambiguity that does not exist. In the end, the prosecutor never suggested to the jury that it was prevented from hearing available incriminating evidence. Thus, this sub-claim is entirely devoid of merit.

**F.    Unsworn Expert Testimony by Prosecutor**

Willoughby's final guilt-phase prosecutorial misconduct claim centers on the prosecutor's discussion of the order in which the gun-shot wounds were inflicted. Willoughby contends that there was no testimony about the order of the wounds, and none of the Commonwealth's witnesses, including a forensic pathologist and a ballistic expert, were able to testify on this issue.    As such, Willoughby argues that the prosecutor's arguments were not supported by record evidence and amounted to unsworn expert testimony.

During closing argument, counsel is permitted to discuss the evidence of record and is given considerable leeway to draw "reasonable inferences" therefrom.    *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996).    It is improper, however, for the prosecutor to "bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial.'" *Byrd v. Collins,* 209 F.3d 486, 535 (6th Cir. 2000) (*quoting United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995)).    Here, there was no direct testimony about the order in which the wounds were inflicted.    Instead, the prosecutor made clear that he was speculating about the order the shots were fired based on a compilation of Susan Hutchens' eyewitness testimony as well as testimony of the forensic pathologist, Dr. Nichols.    More particularly, Hutchens testified as to where each of the defendants and witnesses were located before shots were fired.    And Dr. Nichols testified about the location of each entrance and exit wound, which included the likely trajectory of the bullet. Additionally, Dr. Nichols testified as to which shots would have been lethal, which injuries were sustained pre and post-mortem, and how much time would have elapsed between each lethal injury and death.    From a combination of this testimony, the prosecutor drew

reasonable inferences about the order the shots were fired.

Even if the prosecutor's comments were not based on reasonable inferences drawn from the evidence, Willoughby has not shown that these comments caused any undue prejudice. The jury found Willoughby guilty of murdering Joe Norman under a principal liability theory. That conclusion was supported by testimony that Norman sustained three gunshot wounds from 9 millimeter bullets that were recovered from his body. The evidence also indicated that Willoughby was the only person to fire a 9 millimeter handgun, establishing that Willoughby must have shot and killed Joe Norman. Given the strength of this proof, the prosecutor's comments on the order in which Norman sustained each gunshot wound had little impact on the jury's finding.

Similarly, the order in which Durrum and Greene sustained each gunshot wound had no bearing on the jury's determination of Willoughby's guilt. Willoughby was found guilty of murdering each of these victims under the "combination" instruction, which instructed the jury to find Willoughby guilty if they believed beyond a reasonable doubt that he acted either as the principal or accomplice, but were unable to determine the role in which he acted. The evidence clearly established that both Willoughby and Halvorsen fired shots at the victims, and that one or more of those shots were fatal. However, it was not as clear as to who fired the fatal shot at each victim. The evidence established beyond a reasonable doubt that Willoughby was guilty under this instruction – one of the defendants was the principal, and the other was necessarily the accomplice. Because the identity of the principal and accomplice was not necessary under this instruction, the order the shots were fired was also irrelevant and could not have had an impact on the jury's determination. Accordingly, the prosecutor's comments on the order the wounds were inflicted were not

improper, nor did they deprive Willoughby of a fair trial.

## G.    Conclusion

Even when considered collectively, the prosecutor's comments during guilt-phase closing arguments did not deprive Willoughby of due process.  As already explained, the statements properly discussed the record evidence, arguments of defense counsel, or rulings of the trial court.  The comments did not mislead the jury, nor did they impact the jury's verdict, particularly given the strength of the evidence against Willoughby. Accordingly, the Kentucky Supreme Court's denial of this claim was not "contrary to" nor an "unreasonable application" of clearly established federal law as determined by the Supreme Court of the United States.

## Claim 4 – Caldwell Violation

Willoughby asserts that his Eighth and Fourteenth Amendment rights were violated because the jury was impermissibly and repeatedly informed during voir dire, closing arguments, and in the penalty-phase instructions that their determination on the death sentence was only a recommendation.  More to the point, Willoughby contends that he was denied a fair trial and sentencing because the jury was improperly led to believe that an ultimate determination on the appropriateness of the death sentence rested elsewhere. This, Willoughby argues, is a clear violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

During voir dire, the prosecutor specifically asked eight of the twelve jurors if they understood that during the penalty phase they would be required to recommend to the court whether the death penalty should be imposed.  For example, the prosecutor asked one juror whether she understood that "the jury recommends the imposition of the death penalty to the judge who then will determine whether or not it's going to be imposed."  (TE

278).  Each of the eight jurors confirmed that they understood the prosecutor's qualification.

In fact, one juror responded that she could "recommend the life sentence if the evidence

leaned to that," and that she "would be able to recommend any of those three [sentencing

options – number of years, life sentence, or the death penalty] depending on what, you

know, was presented to [her]."  (TE  910).

During penalty-phase closing arguments, the prosecutor again reminded the jury that

their sentencing determination was a recommendation to the court.

> In these instructions it's very clear that your recommendation, your verdict,
> is a recommendation to [the trial court judge] in this case.  You don't set the
> sentence in this case; you recommend it.

(TE 2537).  According to Willoughby, the prosecutor went on to use the word "recommend"

twenty times in his closing arguments.

The trial court also instructed the jury that they may "recommend" a particular

sentence as to each count.  For example, in Instruction No. 59, the trial court instructed as

follows:

> For the murder of Joe Norman you may recommend that the defendant,
> Mitchell Willoughby, be sentenced to (a) confinement in the penitentiary for
> a term of not less than 20 years; (b) to confinement in the penitentiary for life;
> or (c) to death, in your discretion, but you cannot recommend that he be
> sentenced to death unless you are satisfied from the evidence beyond a
> reasonable doubt that the statement listed as an Aggravating Circumstance
> in Instruction No. 60 exists, in which event you must designate in writing,
> signed by the Foreman, that you found the aggravating circumstance to exist
> beyond a reasonable doubt.
> . . .
> You shall not recommend the death penalty unless you believe the weight of
> the aggravating circumstances, if any, exceeds the weight of the mitigating
> circumstances, if any.
> . . .

(TE 18 2512-13).

## A.    State Court Decision

Although Willoughby never objected to the prosecutor or court's use of "recommend" during the trial, he did present this Eighth and Fourteenth Amendment claim  to the Kentucky Supreme Court on his direct appeal.  The Kentucky Supreme Court analyzed the prosecutor's statements during voir dire and closing argument in great detail under *Caldwell v. Mississippi*, 472 U.S. 320 (1985), holding that the prosecutor's reference to the jury's sentencing determination as a "recommendation"  was not reversible error because the statements did not diminish the jury's sense of responsibility.  *Halvorsen*, 730 S.W.2d at 923-24. The Supreme Court also addressed the trial court's use of "recommend" in the penalty-phase instructions, albeit in much less detail, stating:

> We note that no objections were made to any of the question on voir dire for the very good reason there was nothing to object to.  This drum beat of complaint about the use of "recommend," which is in the statute *and necessarily the instructions*, seems to arise in every case.  We suggest that the trial court or prosecutor, or both, emphasize to the jurors that the use of the term "recommendation" in a death penalty case does not, in any fashion, diminish or lessen the responsibility of the jury in imposing the death penalty.

*Id.* at 925 (emphasis added).  Because these claims were addressed on their merits, they are entitled to deferential review under § 2254(d).

As Willoughby points out, though, the Kentucky Supreme Court did not specifically discuss his Fourteenth Amendment challenge to the repeated use of "recommend." Willoughby argues this claim must be reviewed *de novo* as a result.  However, pursuant to *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770 (2011) and *Johnson v. Williams*, – U.S. –, 133 S.Ct. 1088, 1094 (2013), the Kentucky Supreme Court is presumed to have also adjudicated this claim on its merits because it was presented on direct appeal and the Kentucky Supreme Court denied relief.

The presumption of adjudication on the merits is particularly appropriate here. The United States Supreme Court recognized that "a state court may not regard a fleeting reference to a provision of the Federal Constitution . . . as sufficient to raise a separate federal claim." *Johnson*, 133 S.Ct. at 1095. The state court may choose not to expressly address the claim, yet the decision is still presumed to be an adjudication on the merits. *Id.* That appears to be the case here. Willoughby challenged repeated references to the jury's sentencing determination as a "recommendation" in a four-page argument to the Kentucky Supreme Court. The Fourteenth Amendment was mentioned in a single line at the very end of the argument. This is the type of fleeting argument the United States Supreme Court recognizes that lower courts may choose not to specifically address. However, the ultimate rejection of the claim is still presumed to be an adjudication on the merits that is entitled to deferential review under § 2254(d).

Willoughby opposes this conclusion in his habeas petition and argues that the entire claim must be reviewed *de novo*. Even if Willoughby were correct, though the Court is sure he is not, Willoughby's attempt to escape review under § 2254 is futile because this claim is entirely without merit, even if it were reviewed *de novo*.

**B.  Applicable Law**

Willoughby principally asserts that the repeated qualification of the jury's sentencing determination as a "recommendation" amounted to a *Caldwell* violation. In *Caldwell v. Mississippi*, the prosecutor argued to the jury that if it imposed the death penalty, that decision would not be final, but would instead be automatically reviewed by the Mississippi Supreme Court. 472 U.S. at 325. The Supreme Court held this argument violated the defendant's Eighth Amendment rights because it minimized the jury's sense of the "truly

awesome responsibility" for determining the appropriateness of death and, therefore, tainted the reliability of the jury's determination. *Id.* at 341. The Court also found the argument to be entirely inaccurate, "both because it was misleading as the nature of the appellate court's review and because it depicted the jury's role in a way fundamentally at odds with the role that a capital sentencer must perform." *Id.* at 336. According to the Court, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-29.

The Supreme Court later clarified the scope of a *Caldwell* violation. In *Dugger v. Adams*, the Court stated, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." 489 U.S. 401, 407 (1989). However, "if the challenged instructions [or arguments] accurately described the role of the jury under state law, there is no basis for a *Caldwell* claim." *Id.*

In *Kordenbrock v. Scroggy*, the Sixth Circuit sitting *en banc* applied *Caldwell* and *Dugger* to a claim that is remarkably similar to Willoughby's claim here. 919 F.2d 1091, 1101 (6th Cir. 1990). Like Willoughby, the petitioner in *Kordenbrock* challenged his Kentucky murder conviction and death sentence. During *voir dire* at Kordenbrock's trial the prosecutor told jurors that their "recommendation of death, if you gave one as a juror, with your fellow jurors, would not be binding upon the court, but that the court would give it great weight." *Id.* The prosecutor later characterized the jury's sentence as "a recommendation, that is all." *Id.* The trial court also instructed the jury that their sentencing determination was a recommendation.

The *Kordenbrock* Court held that the prosecutor's comments and the court's jury instructions did not amount to a *Caldwell* violation. *Id.* Citing the Supreme Court's clarification of a *Caldwell* violation announced in *Dugger*, the *Kordenbrock* Court stated that "Kordenbrock must show . . . [the comments] improperly described the jury's role under state law in order to water down their responsibility." *Id.* Kordenbrock failed to meet this burden because the comments were technically consistent with Kentucky law. *Id.* In Kentucky, the jury considers whether any mitigating or aggravating circumstances exist, and then recommends a sentence to the court. *Id.* (citing K.R.S. § 532.025(1)(b)). Upon the jury's recommendation, the judge ultimately determines the defendant's sentence. *Id.* Because the prosecutor's comments and the instructions were consistent with this law, the *Kordenbrock* Court determined that a *Caldwell* violation did not occur.

### C.    Analysis

*Kordenbrock* remains binding precedent in this Circuit and, thus, controls the fate of Willoughby's *Caldwell* claim. Because the prosecutor's comments and the trial court's instructions were consistent with Kentucky law – which specifically states that juries "recommend" a sentence – no *Caldwell* violation occurred at Willoughby's trial. Any "repeated emphasis" on the advisory nature of the jury's determination does not change this conclusion. As the *Kordenbrock* Court recognized, "emphasizing the 'advisory' role of the jury, or the fact that the jury is making a 'recommendation' to the judge, does not support a *Caldwell* violation" so long as the statement is consistent with local law. *Kordenbrock*, 919 F.2d at 1101. Therefore, it would be a futile effort for this Court to count the instances that "recommend" was mentioned or consider whether the repeated emphasis somehow violated Willoughby's constitutional rights. In the end, describing the

jury's determination as a recommendation was consistent with Kentucky law at the time of Willoughby's trial and, therefore, no *Caldwell* violation occurred.

Willoughby recognizes that *Kordenbrock* is binding precedent in this Circuit, but insists that the Court not follow the decision because it was wrongly decided.[6]  More specifically, Willoughby argues that the *Kordenbrock* Court erred in concluding that the disputed comments were consistent with Kentucky law.  Because the comments were erroneous under Kentucky law, Willoughby asserts that Kordenbrock did state a viable *Caldwell* claim.   Despite Willoughby's disagreement with the Circuit's decision in *Kordenbrock*, this court cannot ignore biding precedent.  "Absent a clear directive from the Supreme Court or a decision of the Court of Appeals sitting *en banc*, . . . , a district court, is not at liberty to reverse the circuit's precedent."  *Hall v. Eichenlaub*, 559 F. Supp. 2d 777, 781-82 (E.D. Mich. 2008).   Unless *Kordenbrock* is reversed, this Court is bound by the decision of the Sixth Circuit Court of Appeals.  *Id.*

Willoughby also asserts that the prosecutor's comments and the jury instructions violated his right to a fair trial under the Fourteenth Amendment, and suggests this claim is distinct from a *Caldwell* violation.  Willoughby does not explain why a distinct analysis is warranted.  Rather, he cites two cases, *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) and *Wood v. Marshall*, 790 F.2d 548 (6th Cir. 1991), for the general proposition that prosecutorial misconduct and improper jury instructions violate a defendant's right to a fair

_____

[6]   In his petition, Willoughby also argued that *Kordebrock* was decided under the "unreasonable application of federal law" portion of § 2254(d)(1), and because that portion of the statute is unconstitutional, the *Kordenbrock* decision is somehow invalid or has little precedential effect on his claim.  However, in his reply, Willoughby correctly concedes that *Kordenbrock* was not decided under AEDPA.  (Doc. # 21 at 5 n. 1).  In fact, *Kordenbrock* was decided in 1990, six years before AEDPA was signed into law.  Based on Willoughby's appropriate concession, the Court will not consider his alternative reason for disregarding *Kordenbrock*.

trial under the Fourteenth Amendment. Willoughby does not, however, offer any analysis in support of this claim. Nonetheless, Willoughby's attempt to find another means to challenge the statements is fruitless.

The prosecutor's comments did not amount to prosecutorial misconduct and did not deprive Willoughby of a fair trial. On habeas review, the Court must employ a two-part test to determine whether the prosecutor's comments violated Willoughby's constitutional right. *Slagle v. Bagley*, 457 F.3d 501, 515 (6th Cir. 2006). First, the Court must determine whether the prosecutor's statements were improper. *Id.* at 516. If they are determined to be improper, the Court must then consider four additional factors to decide whether the comments were sufficiently flagrant to warrant reversal. *Id.* Here, the prosecutor's repeated emphasis to the jury that their sentencing determination was a recommendation was not improper because those statements were consistent with Kentucky law at that time.

For similar reasons, the jury instructions did not deprive Willoughby of the right to a fair trial. Jury instructions violate a defendant's right to a fair trial when they are contrary to state law and undermine the reliability of the verdict. *Williams v. Anderson*, 460 F.3d 789, 810 (6th Cir. 2006). The jury instructions at-issue here cannot be said to have rendered Willoughby's trial fundamentally unfair under this test. As the Court has already held, the jury instructions were consistent with Kentucky law at the time given, and they did not, therefore, undermine the reliability of the verdict. Thus, Willoughby's constitutional rights – be it his Eighth or Fourteenth Amendment rights – were not violated when the jury was told that their sentencing determination was a recommendation.

**Claim 5 - Prosecutorial misconduct during sentencing phase**

As his fifth ground for habeas relief, Willoughby contends the prosecutor made seven improper comments during penalty-phase closing arguments that, when considered cumulatively, deprived him of a fair trial. Specifically, Willoughby challenges the prosecutor's statements about (1) the concerns of a murderer escaping from prison or causing additional harm while incarcerated, (2) the death penalty as a deterrent, (3) the jury's sentencing determination as a recommendation, (4) Willoughby's demeanor during trial, (5) concerns about a murderer's ability to be rehabilitated during incarceration, (6) and praising the work of the police officers and prosecutors that worked on the case. Additionally, Willoughby argues that it was improper and prejudicial for the prosecutor to show the jury oversized pictures of the victims' bodies that were never admitted into evidence.

**A.     State Court Decision**

Willoughby pursued this claim on direct appeal from his conviction and sentence. The Kentucky Supreme Court adjudicated this claim, holding:

> Both Halvorsen and Willoughby complain that repeated misconduct by the prosecutor during the penalty phase closing argument deprived them of a fair trial. Our examination of the closing argument has convinced us that this complaint is without merit. Brief portions of the argument were irrelevant, but on the whole, the argument was fair comment on the evidence.
>
> Considering the overwhelming nature of the evidence against Halvorsen and Willoughby, including their own admissions, we quote from *Timmons v. Commonwealth*, 555 S.W.2d 234, 241 (Ky. 1977), which concluded:
>
>> We do not think the prosecutor's arguments exceeded the bounds of propriety,  nor do we think that it could have added much fuel to the fire anyway.
>
> The same comment applies here.

*Halvorsen*, 730 S.W.2d at 925-26. Despite this analysis, Willoughby argues there is no indication that the Kentucky Supreme Court adjudicated the *federal* constitutional claim on the merits. Willoughby does not present any justification for this argument, nor does any argument seem apparent to the Court.

Pursuant to *Johnson v. Williams*, 133 S.Ct. 1088 (2013), the Court presumes that the Kentucky Supreme adjudicated Willoughby's federal constitutional claim on its merits. In *Johnson*, the Court held that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits . . . ." *Id.* at 1096. In that case, the state court rejected a prisoner's challenge that the trial court improperly dismissed a juror in violation of the Sixth Amendment and California Penal Code. *Id.* at 1093. The state court cited to United States Supreme Court authority in rejecting the claim, but did not explicitly state whether it was addressing the claim on federal or state grounds, or both. *Id.* The United States Supreme Court held, *inter alia*, that it was appropriate to presume the claim was adjudicated on its federal merits even if the state court only addressed state precedent, particularly when state precedent fully incorporates a related federal constitutional right. *Id.* at 1094-95.

Here, the Kentucky Supreme Court's decision cited Kentucky law on prosecutorial misconduct that fully incorporates the related federal right. *Halvorsen*, 730 S.W.2d at 926. More specifically, the court cited its prior decision in *Timmons v. Commonwealth*, 555 S.W.2d 234, 241 (Ky. 1977) in holding that the prosecutor's statements were neither improper nor "added much fuel to the fire." *Halvorsen*, 730 S.W.2d at 926. The United States Supreme Court applies the same two-part standard to determine whether

prosecutorial misconduct violates a defendant's federal right to due process of law. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). As such, it is appropriate to presume that the Kentucky Supreme Court adjudicated Willoughby's claim on its merits. This claim is, therefore, entitled to deferential review under § 2254(d).

### B.    Applicable Law

The Kentucky Supreme Court's denial of Willoughby's prosecutorial misconduct claim must be analyzed against the "clearly established law" announced in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and its progeny. As previously discussed, *see supra* Part IV, Claim 3, subsection B, before a federal court can overturn a conviction, the prosecutor's statements must be both improper and "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Improper statements are not to be considered in isolation, but must be considered cumulatively and in the context of the entire trial. *United States v. Young*, 470 U.S. 1, 11 (1985). And when a prisoner challenges statements made during the sentencing phase, the Court must consider those statements against any attendant aggravating and mitigating circumstances. *Bates v. Bell*, 402 F.3d 635, 648 (6th Cir. 2005). Ultimately, a prisoner is deprived of due process when prosecutorial comments during the sentencing phase are "so egregious that they effectively 'foreclos[e] the jury's consideration of . . . mitigating evidence.'" *Id.* at 649 (*quoting DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2002)).

### C.    Analysis

Following the two-part test for prosecutorial misconduct claims, the Court will first assess each of the prosecutor's comments individually to determine whether the Kentucky

Supreme Court unreasonably applied clearly established federal law in determining that the comments were not improper. The Court will then determine whether the Kentucky Supreme Court unreasonably applied federal law in determining that none of the comments, even if improper, were flagrant such that Willoughby was denied due process.

### 1. Alleged Improper Comments

#### a. Suggestion that Willoughby would cause future harm, escape from prison, and had no ability to be rehabilitated.

Willoughby challenges a series of statements made by the prosecutor at the outset of his penalty-phase closing argument. According to Willoughby, the prosecutor improperly suggested that he would be a threat to inmates and prison personnel if he were given a life sentence, that he might escape from prison, that he could not be rehabilitated with a life sentence, and that a sentence of death was the only punishment to serve as an adequate deterrent to future murderers of this kind.[7] Willoughby asserts that these comments

---

[7] The prosecutor stated:

What they don't realize is that the Kentucky State Penitentiary in Eddyville is a city within a few acres, and you're not taking the person out of this world with a life sentence.

What should we expect of an individual who has committed a ghastly act of murder and is sentenced to life? What do you expect? Do you think that he's suddenly rehabilitated upon entry into the penitentiary? He's transformed? You think that happens? Do you think that he miraculously loses his rage or his callousness and he grasps the concept somewhere in this time period that the human life is the most precious thing on earth?

I wonder if the anti-death penalty people have ever really considered – ever really considered the welfare of hundreds of thousands of people who are subject to the risk of convicted murderers. Is the inmate population safe? The young man convicted of burglary or larceny, theft, who goes to the penitentiary, is he safe? What prevents a convicted murderer with a life sentence from getting a shiv and holding it to the kid's neck, the young burglar's neck, and demanding escape? What prevents that?

Well, that's easy to say – the answer, segregation from prison population. Well that's fine, but what about the prison officials, people like George Coons, people who have to handle the murderer with the multiple life sentence? That's a reality. That's in the real world. Every second every person who is in this capacity of watching, of being in control, has to have a razor sharp sense of awareness in a penitentiary, because their lawness can be the opportunity, the chance, for the convicted murdered to effect his escape. That's reality.

improperly inflamed the passions of the jury.

It is clearly established that prosecutor's "remarks which were 'wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice' jeopardized the defendant's right to a fair trial." *Bowling v. Parker*, 344 F.3d 487, 516 (6th Cir. 2003) (quoting *Viereck v. United States*, 318 U.S. 263, 247 (1943)). When the prosecutor's comments at-issue here are considered in isolation,

---

And his bargaining power, the threat of an innocent person whose job it is just to maintain the person. Well, our response to that person in the penitentiary, don't kill him now, Frank, because if you do we're going to give you a life sentence. Is that a detent to a person who's been convicted of murder, with a life sentence, multiple murders? Well I suggest to you that the death penalty is needed, much needed deterrent for the inmate population of our penal institution.

Is it conceivable to you that a convicted murderer can escape from an institution and thus subject untold numbers of innocent citizens in a community to further tragedy? Well, I hope you understand that it is. In the last few years, we saw Martin Luther King, the greatest black leader who ever lived, gunned down; the person caught, arrested, tried, convicted, sentenced and placed in the extremely tight security of the Tennessee maximum prison in Brushy Mountains, and he escaped, and thank God he broke his ankle when he jumped down and he was gone for three days but they finally caught him.

Think about the death penalty as a deterrent.

. . .

Well what about the death penalty as a deterrent? Does it actually stand as a threat to the criminal who is out there right now, thinking about an armed robbery of a liquor store, or the burglary of somebody's home? Do they kill the eye witness? Do they think about that and thus escape capture because nobody can identify them?

Obviously nothing that occurs in a judgment or verdict will totally affect every citizen, every potential murderer or criminal. The death penalty conviction will not stop future murders in this community. It will not, totally. Won't stop them all. But it most certainly is a valuable and effective deterrent to individuals – to certain individuals who really believe the death penalty will be enforced by Commonwealth Attorney's offices and juries, the citizens in the community. If they believe that, then it can be a deterrent.

If the belief is that you'll never get the death penalty, then the value of the life, of the potential innocent victim eye witness, goes way down. The question of deterrence is easily resolved. As to the future threat of a convicted murdered to society, Gary Gilmore will never kill another college student, ever. Can the Illinois authorities guarantee that for Richard Speck? Can California authorities guarantee that about Charles Manson?

Kentucky citizens, ladies and gentlemen of the jury, have a right to be protected from any person who kills innocent people for no reason. They have a right to be guaranteed – guaranteed that a convicted murderer under our law will never kill again. That's not murder. That's protection of society.

(TE 2533-37).

they could be construed by reasonable jurists to have been designed to arouse the passion and prejudice of the jury. However, when the comments are properly reviewed in context, it is apparent that they were not designed to inflame the jury. *See Beverly*, 369 F.3d at 543 (holding that statements must be examined within context of entire record).

The prosecutor opened his closing argument by attempting to curtail any juror hesitation to impose the death penalty based on the notion that people do not have the right to kill others. The prosecutor was concerned some jurors might refuse to recommend the death penalty because the Bible commanded that "thou shalt not kill." (TE 2529-30). He was also concerned that some jurors might believe that life imprisonment serves the same societal interests as the death penalty; namely, keeping murderers from reentering society. Based on these concerns, the prosecutor attempted to explain that it is not always wrong to kill another person, citing to self defense and defense of others as examples of justified killing. The comments at-issue here were made to show that the death penalty served another legitimate purpose – the protection of society – that a sentence of life imprisonment could not always achieve.

Importantly, the prosecutor's comments were broad statements about the general purpose of the death penalty. They did not suggest, as Willoughby argues, that he might pose a threat to inmates or prison personnel, nor did they suggest that he might escape from prison. Additionally, the comments did not suggest that Willoughby could not be rehabilitated. To the contrary, the prosecutor talked about the threat that defendants serving a life sentence pose to others generally, and their general incentive to escape. At one point during the disputed comments, the prosecutor even mentioned a hypothetical inmate, "Frank," in explaining that he has minimal incentive to comply with rules in prison

if he is already serving a life sentence.

These statements are similar to those considered by the Sixth Circuit on previous occasions and found not to be improper.    *See Beuke v. Houk*, 537 F.3d 618, 647 (6th Cir. 2008); *Byrd v. Collins*, 209 F.3d 486, 538-39 (6th Cir. 2000); *Hicks v. Collins*, 384 F.3d 204, 219 (6th Cir. 2004).  For example, in *Beuke*, the prosecutor "began his closing argument with broad statements about the death penalty in general, noting that 'our society will take life' in order 'to let a message ring out' to 'criminals and potential criminals in this community that we won't tolerate this.'" 537 F.3d at 647.  The prosecutor also explained that, "where aggravating circumstances sufficiently outweigh mitigating factors, the death penalty sends 'a message of justice[ ] to the law-abiding people in the community,' and 'the only way the public can be satisfied . . . is if capital punishment is measured out.'" *Id.*  The Sixth Circuit held that when these statements are considered in context, they are "general background information on the death penalty and the need to punish guilty people, rather than an impassioned command that the jurors must recommend death based on some amorphous societal obligation." *Id.*

The Sixth Circuit's holding in *Beuke* is directly applicable here.  The prosecutor did not command that the jurors recommend the death penalty based on a fear that Willoughby would cause additional, future harm to society.  Instead, the sole purpose of the argument was to convey to the jury that society approves capital punishment in certain circumstances, and that the death penalty serves interests that a life sentence cannot. Additionally, the prosecutor never mentioned Willoughby during this portion of his argument.  Rather, after giving this general background information, the prosecutor moved to a discussion of specific mitigating and aggravating evidence to support the death penalty

in this particular case. Thus, as in *Beuke*, the prosecutor's statements were not improper.

Additionally, the comments at issue here are unlike those in *Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005), a case cited by Willoughby. In that case, the prosecutor told the jury they would become an accomplice to a future murder if they permitted the defendant to live. The prosecutor stated:

> By permitting this man to live, we in essence become an accomplice. We have assisted him in his criminal undertaking. *If you, based on the law and the facts of this case, choose not to execute this defendant, you have passively issued a warrant of execution for someone else.* We don't know who it is. We don't know when it will take place; but ladies and gentlemen, I think you can see from the proof in this case that the only thing that will be left out of that warrant of execution that someone else is to receive, if this man lives, is the name of the victim and the date that it takes place. This man is going to kill again if he is not stopped first, and I think that is obvious to each of you . . . .

*Id.* at 642. The Sixth Circuit held that these comments appealed to the fears of the individual jurors and to emotion and were, therefore, improper. *Id.* at 644. Here, in contrast, the prosecutor never suggested that Willoughby would escape or kill another person. Instead, he made references to escape and future harm only to show that a sentence of life imprisonment is not always justified. Given the context of these statements, the Kentucky Supreme Court did not unreasonable apply clearly established federal law in holding the statements were not improper.

The prosecutor's statements about deterrence deserve additional comment. Willoughby relies on *Henley v. Bell*, 487 F.3d 379 (6th Cir. 2007) for the proposition that it is improper for a prosecutor to comment on the deterrent effect of the death penalty. In that case, the prosecutor asked the jury to "send a message" by imposing the death penalty. *Id.* at 390. The Sixth Circuit found the comment to be improper, but held there was no

prejudice because the trial court admonished the prosecutor to discontinue that line of argument. *Id.*

The prosecutor's statement on deterrence at issue here do not go as far as those in *Henley*. Here, the prosecutor did not ask the jury to "send a message" or otherwise impose the death penalty with the hope that it will deter future conduct. Rather, the prosecutor's comments on deterrence are akin to those in *Beuke* which were intended to provide "general background on the death penalty and the need to punish guilty people." *Beuke*, 537 F.3d at 647. In fact, the prosecutor readily admitted that the death penalty will not stop all criminals, but that it might impact the decisions of some future criminals. Because of this qualifying language, and the general nature of the comments, the Kentucky Supreme Court did not unreasonably apply federal law in finding these statements were not improper.

### b.    Comments on Willoughby's remorse

Willoughby asserts that the prosecutor improperly commented on his apparent lack of remorse during the course of trial. The prosecutor stated:

> You know we've watched these defendants – we've watched these defendants for days on end in this courtroom and we've listened to each of them explain how this callous crime occurred, and not one time did we ever see the slightest hint of remorse for what they did. Not one time.

(TE 2540). Willoughby argues these comments were improper because they violated his Fifth Amendment right not to testify during the penalty phase and flagrantly misrepresented the evidence. Neither assertion has merit.

In instances where a defendant does not testify at trial, courts reach varying conclusions on whether a prosecutor infringes on the defendant's Fifth Amendment right

not to testify by discussing lack of remorse. *See, e.g., Cunningham v. Perini*, 655 F.2d 98, 100 (6th Cir. 1981) (holding that comment that defendant just sat and stared during trial did not run afoul of the Fifth Amendment); *Isaacs v. Head*, 300 F.3d 1232 (11th Cir. 2002) (examining courts' varying approaches). This Court, however, need not wade through the conflicting precedent in this case because Willoughby did, in fact, testify during the guilt phase of his trial. Once a defendant places his own demeanor in evidence by taking the stand to testify, as Willoughby did, his appearance at trial can be discussed by the prosecutor and considered by the jury. *Cunningham*, 655 F.2d at 100.

Defendant's demeanor was not removed from the jury's consideration during the penalty phase simply because Willoughby chose not to testify during the sentencing phase. As the Kentucky Supreme Court has held, "[w]hen the same jury sits in both parts of a bifurcated proceeding in a capital murder trial, all evidence introduced in the guilt phase may be considered by the jury during the sentencing phase." *Harper v. Commonwealth*, 978 S.W.2d 311, 317 (Ky. 1998). Willoughby testified during the guilt phase of his trial. Willoughby's counsel even asked the jury to consider portions of his guilt-phase testimony during his penalty-phase closing argument. Under these circumstances, it was not improper for the prosecutor to discuss Willoughby's demeanor, including lack of remorse, during penalty-phase closing arguments.

The prosecutor also did not mischaracterize the evidence by commenting on lack of remorse, contrary to Willoughby's assertion. A police detective testified that Willoughby appeared "sorry and remorseful" when he was interviewed shortly after the murders. (TE 1657). However, the prosecutor's comments were not directed at Willoughby's remorse, or lack thereof, at or near the time of the murders, but to Willoughby apparent lack of

remorse at trial. Willoughby has not cited any portion of his testimony where he overtly expressed remorse. Rather, he cites to those portions of his testimony where he justified the murders based on self-defense and intoxication. The prosecutor's comment on lack of remorse did not mischaracterize this testimony.

### c. Images of victims' bodies

Willoughby argues that the prosecutor improperly showed the jury slides of the victims' bodies during his closing argument. The slides, according to Willoughby, were never introduced into evidence and, thus, not available for the prosecutor to use during his argument. Additionally, Willoughby contends that the slides depicted enlarged photographs of the victims' bodies and were used only to inflame the passions of the jurors. Willoughby's argument, however, is premised on the misleading notion that no images of the victims' bodies were admitted into evidence.

During the guilt phase of Willoughby's trial, Kentucky State Police Officer Robert Stamps testified that he took photographs of the bodies of Joe Norman and Joey Durrum on the Brooklyn Bridge on the night of January 13, 1983. The prosecutor showed Stamps four slides, and Stamps verified that those slides depicted accurate copies of the photographs he took. The prosecutor then moved to admit photographed copies of the slides into evidence rather than the slides themselves. Then, with the court's permission, the prosecutor projected images from the slides onto a screen as Stamps described the images.

It was not improper for the prosecutor to use the projected images during his sentencing-phase closing argument. Duplicate photographs of each image had been admitted into evidence during the guilt phase, and, more importantly, the prosecutor was

granted permission from the court to show the enlarged images during the guilt phase. Because the jury may consider evidence admitted during the guilt phase in its sentencing determination, and because the jury saw each of the images during the guilt phase, the prosecutor did not overstep his bounds by showing the images during his sentencing-phase closing argument. *See Bedford v. Collins*, 567 F.3d 225, 235 (6th Cir. 2009); *Harper,* 978 S.W.2d at 317.

### d.      Vouching and Bolstering Comments

As his final claim of prosecutorial misconduct, Willoughby argues the prosecutor improperly vouched for the integrity of police officers and prosecutors who worked on his case. The challenged comments were made near the end of the prosecutor's penalty-phase closing argument, where the prosecutor attempted to explain the unique duties that various individuals and groups perform in a criminal trial. Specifically, the prosecutor explained the duties of police officers, stating:

> But other people have duties in this case. The police; you've got a multiple police influx in this case from the state police, from people in Richmond, local City police departments down around the river to the Lexington police department, particularly in the area of scientific investigations and the collection of evidence, and the crime lab in Frankfort, police – state policemen who did tremendous amounts of analyzing and presentation of it to you. Their duties in a case, any case, but particularly in this case, a death penalty case, is to collect everything so that you'll know, if you're on a jury, you'll know exactly all the facts. Because when we started this case I told you that I accepted the burden of proving it to you beyond all doubt. How can I do that if I don't have the evidence; if the police don't go out and do it and spend the hours collecting and taking statements and corroborating evidence that Susan Hutchens tells us, proving that she's telling the truth, by going to the witness or whoever it is and finding whatever she says he said or did. I know it takes a lot of work, and you don't have to do that, if you're a cop. You can work nine hours and go home. You can shuck it off. But you didn't see it in this case.
>
> You saw other things in this case. You saw very deep concern by policemen

for the defendant's rights in this case, very deep concern, the admonishment of rights, calling Willoughby's parents for him, things like that, human things. They had a duty in this case and they did it, ever single one of 'em.

(TE 2255-56).

The prosecutor then explained the duties of the Commonwealth Attorney's office:

The Commonwealth has a duty in the case. This is not an easy case to present. I'm sure you can well imagine by this time – you probably never thought of it before – but this is a tough case, particularly when you're going to ask for the death penalty and you know you are, then it's got to be painfully prepared, because this is not a case to be decided by beyond a reasonable doubt, but beyond all doubt. And I told you that . . . we accepted that burden, back on July the 5th.
. . .
It's a – it's a proud feeling that we have to be able to be entrusted with the responsibility to have a burden like this. And particularly I'm proud of being able to have an office of assistants who can grasp a case of this magnitude, because you leaned from somewhere in the testimony that these two were at the scene, at the arrest, working with the police and they've worked until this very day.

(TE 2256-57).

Within his closing argument, the prosecutor also discussed the duties of others, including defense counsel, the judge and jury. The prosecutor explained that defense counsel had a duty "to make sure this is a fair trial for their clients," and even praised the work of defense counsel, stating: "[t]hey did it well and they are to be commended." (TE 2556). The prosecutor also explained that the judge served a unique purpose, stating: "[h]is duty is to make sure this is a fair trial and to tell you what the law is in the case, instructions on the law, properly, and he's done that." (TE 2257). Finally, the prosecutor discussed the duties of the jury, including listening to the evidence, determining guilt or innocence and an appropriate sentence. With the context of the challenged statements in mind, the Court will address the statements about the police and prosecutors in turn.

71

Willoughby relies on *Moore v. Commonwealth*, 634 S.W.2d 426 (Ky. 1982) and *Armstrong v. Commonwealth*, 517 S.W.2d 233 (Ky. 1974) for the proposition that "[t]he Kentucky Supreme Court has held that this kind of personalized vouching for the integrity of the police" and prosecutor's staff is highly improper. However, on federal habeas review, the Court is not concerned with whether the prosecutor's comments violated state precedent. Instead, the relevant inquiry is whether the Kentucky Supreme Court's decision at-issue here was "contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States.*" 28 U.S.C. § 2254(d) (emphasis added). As such, the Kentucky Supreme Court's decision in *Moore* and *Armstrong* is irrelevant to the adjudication of this claim.

Applying clearly established federal law, fair minded jurists could disagree about whether these comments were proper. It is improper for a prosecutor to vouch for the credibility of a government witness "by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the [Commonwealth's Attorney] behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). Improper vouching might involve "blunt comments" such as "I think he is honest," or comments that "imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Id.* (*quoting United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992)). However, it is not improper for a prosecutor to comment on a witness's credibility when the comments ask the jury to draw reasonable inferences from the evidence presented. *See United States v. Parker*, 49 F. App'x 558, 563 (6th Cir. 2002) (finding that prosecutor's comments on credibility of witnesses were not improper when they "merely referred to the evidence and offered an

explanation for the witnesses' possible motivation to lie or to tell the truth"); *United States v. Weatherly*, 525 F. 3d 265, 271 (3d Cir. 2008) (prosecutor's statement that police officer would be risking career by lying not improper because based on evidence in record).

Here, while the prosecutor opined that police officers performed their duties in investigating the case, the prosecutor also generally pointed to testimony supporting this assertion. For example, he acknowledged that police officers might shirk their duties, but explained to the jury that "you didn't see it in this case." (TE 2255). The prosecutor also asked the jury to consider testimony that officers admonished Willoughby of his rights and called his parents in asserting that the jury "saw very deep concern by policemen for the defendant's rights in this case." (TE 2256). Giving the Kentucky Supreme Court the "substantial breathing room" to determine prosecutorial misconduct claims that this federal habeas must, the Kentucky Supreme Court did not unreasonably apply federal law in finding that these comments were not improper; fair-minded jurists could conclude that these comments asked the jury to draw inferences about the police officers' conduct based on evidence presented. *See Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) ("[T]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.") (*quoting Donnelly v. DeChristofor*, 416 U.S. 637, 645 (1974)).

The propriety of the prosecutor's comments on the efforts of himself and his staff also presents a close question. Willoughby argues the prosecutor's comments implied that they would not have prosecuted Willoughby if they did not believe he was guilty. Of course, "it is always improper for a prosecutor to suggest that a defendant is guilty merely because

he is being prosecuted or has been indicted." *United States v. Bess*, 593 F.2d 749, 754 (6th Cir. 1979). Likewise, it is improper for a prosecutor to interject his personal opinion. *Id*. However, neither impropriety occurred here. The prosecutor merely commented that two assistant prosecutors had worked the case since the day of Willoughby's arrest, and asked the jury to recall testimony to that affect. The prosecutor also explained that he proudly accepted the burden of proof in this case, though he never suggested his personal opinion as to whether he had met that burden. Neither of these comments directly or indirectly suggested the prosecutor's feelings on Willoughby's culpability, nor did they place the prestige of the government behind the case. As a result, the Kentucky Supreme Court did not unreasonably apply clearly established federal law in holding that these comments were not improper.[8]

## 2.    Flagrancy of Comments

After concluding that none of the prosecutor's comments exceeded the bounds of propriety, the Kentucky Supreme Court also concluded that the comments were not flagrant and, therefore, did not deprive Willoughby of due process. *Halvorsen*, 730 S.W.2d at 925. Because this Court has already concluded that the Kentucky Supreme Court reasonably applied clearly established federal law in finding the first prong of the test for prosecutorial misconduct was not met, this Court is not necessarily required to review the Kentucky Supreme Court's holding on the latter prong. Nonetheless, the Court agrees with the

---

[8] Willoughby also challenges the prosecutor's repeated reference to the jury's sentencing determination as a "recommendation," and asserts that these statements violated both his Eighth and Fourteenth Amendment rights. This sub-claim is merely a duplicate of the claim he raised as fourth ground for habeas relief. The Court has already found no merit to that claim, because the comments accurately reflected Kentucky law. *See supra* Claim 4.

Kentucky Supreme Court that the prosecutor's statements, when considered cumulatively, did not deprive Willoughby of due process.

While the Sixth Circuit instructs the Court to consider four factors in determining whether the comments deprived Willoughby of due process, the Court must ultimately consider whether the challenged comments were so egregious that they effectively foreclosed the jury's consideration of mitigating evidence. *See Bates*, 402 F.3d at 648. Willoughby contends that the prosecutor's comments had that precise effect; he offered compelling mitigating evidence which should have led the jury to spare his life. However, when the jury's ultimate sentencing recommendation is considered against the aggravating and mitigating evidence, it does not appear that the prosecutor's comments effectively foreclosed the jury from considering the mitigating evidence.

The jury's recommended sentences for each of the victims demonstrates that they weighed the mitigating and aggravating evidence. The jury recommended that Willoughby serve a life sentence for the murder of Joe Norman. This decision appears to have been motivated by Willoughby's own testimony that he shot Norman in self defense. Willoughby's testified that he did construction work for Joe Norman, and that Norman was an abusive employer who made physical threats and pushed Willoughby on several occasions. Willoughby also testified that Norman frequently refused to pay him. On the day of the murders, Norman asked Willoughby and his co-defendant to come to his house to smoke marijuana. Shortly after they arrived, an argument between the three individuals erupted over money. Norman grabbed a bayonet and threatened to cut Willoughby's heart out. Feeling threatened, Willoughby testified that he fired two or three shots at Norman. After considering this testimony, as well as all other evidence, the jury recommended

Willoughby serve a life sentence for Norman's death.

Conversely, the jury recommended that Willoughby be sentenced to death for the murders of Joey Durrum and Jacqueline Greene. The evidence indicated that each of these victims had nothing to do with the argument between Willoughby, Halvorsen and Norman; rather, they were innocent bystanders. In addition, Susan Hutchens' testimony revealed that Willoughby callously fired two shots at Greene as she was lying on the floor crying from sustaining previous gun shots. The strength of this aggravating evidence supported the jury's recommendation. More importantly, the jury's decision to recommend a life sentence for the murder of Norman, while recommending the death penalty for the murder of Durrum and Greene indicates that the jury weighed aggravating and mitigating evidence.[9]

Despite the strength of the aggravating evidence, Willoughby contends that the jury could not have recommended a sentence of death if it considered his intoxicated state at the time of the murders as well as his remorse. Willoughby believes that the prosecutor's comments caused the jury not to consider this compelling mitigating evidence. This argument, however, assumes that the mitigating evidence was so compelling that it

---

[9] In his reply/traverse, Willoughby argues that the jury recommended a sentence of death for the murders of Durrum and Greene based other improper comments by the prosecutor, and not because of the aggravating evidence. According to Willoughby, the prosecutor suggested that the jury must impose the death penalty in order to deter others from committing similar acts and warned that "anarchy would reign in Lexington" if the death penalty was not imposed in this case. (Doc. # 21 at 10). Having raised this issue for the first time in his reply/traverse, Willoughby is not asserting that these allegedly improper comments entitle him to habeas relief. And given the weight of the aggravating evidence related to the murders or Durrum and Greene, these isolated comments were not likely to cause the jury to recommend the death sentence. The fact remains that the jury recommended different punishments for Norman, Durrum and Greene, which was consistent with the aggravating and mitigating evidence.

outweighed the aggravating evidence. Based on the jury's sentencing recommendations, though, it appears that the jury found some mitigating evidence to be compelling while the jury concluded that other mitigating evidence, such as intoxication, had little strength. In the end, the jury must have considered mitigating evidence based on its decision to recommend a life sentence for Norman's murder. The prosecutor's statements, then, cannot be said to have "effectively foreclosed the jury's consideration of mitigating evidence." *See Bates*, 402 F.3d at 648.

Additionally, the prosecutor's challenged comments had little chance of misleading the jury. The trial court instructed the jury immediately prior to the closing argument that arguments of counsel were not evidence, which had the effect of minimizing any improprieties in the argument. *See Byrd*, 209 F.3d at 537 (holding that instructions to the jury that arguments of attorneys were not evidence may cure any improper closing arguments). Additionally, as the Court already concluded, many of the prosecutor's comments served as general background justification on the death penalty. The comments did not imply that Willoughby deserved the death penalty because of these justifications, but only that the death penalty is an acceptable form of punishment in society because of these general concerns among others. After making these general statements, the prosecutor specifically discussed the aggravating and mitigating evidence related to Willoughby, and asked the jury to recommend a death sentence based on this evidence.

Likewise, the prosecutor's alleged vouching for the integrity of the police officers and his staff had little chance of misleading the jury. In making these statements, the prosecutor never asked the jury to give special credence to the strength of the Commonwealth's case or to the credibility of the police investigation. *See United States v. Carroll*, 26 F.3d 1380,

1389-90 (6th Cir. 1994) (holding it was improper for prosecutor to state, "I submit to you that Robin and Richie Patrick are credible witnesses," and that the comments deprived the defendant of due process where the only evidence against the defendant was the testimony of the Patricks). Instead, these statements were made in the context of praising the work of everyone involved in the trial, including the trial court and defense counsel.

Similarly, the photographs of the victims' bodies did not mislead the jury. As an aggravating circumstance, the Commonwealth was required to prove that Willoughby's actions in connection with killing each victim were intentional, and that Willoughby's actions also resulted in the death of at least one of the other victims. The contested photographs depicted the victims' bloodied bodies as they were found at the Brooklyn Bridge, and revealed the location of many of the gun shot wounds that the victims suffered. The photographs also showed a rope tied around one of the victim's waste and attached to a concrete block, presumably intended to cause the body to sink to the bottom of the river below. The photographs are certainly gruesome, but they accurately depicted the brutality of the murders and were entirely relevant aggravating evidence of Willoughby's intent.

Finally, comments on Willoughby's lack of remorse were not misleading. As the Court already held, these statements were fair comment of Willoughby's demeanor, which he put at issue by taking the stand, and they did not misrepresent any evidence. Moreover, after the prosecutor's closing argument, Willoughby's counsel asked the jury to consider Willoughby's alleged demonstrations of sorrow during his testimony as mitigating evidence. The prosecutor's comments on remorse were preemptively made to refute this mitigation argument. And of greater significance, defense counsel had the last word in arguing that Willoughby did express sorrow, which negated the effect of any allegedly misleading

comments on lack of remorse.

Ultimately, the Kentucky Supreme Court did not unreasonably apply federal law in holding that the prosecutor's allegedly improper statements during closing argument did not deprive Willoughby of a fair trial. The prosecutor's comments were not so egregious and inflammatory that they effectively foreclosed the jury's consideration of mitigating evidence. *See Bates*, 402 F.3d at 648. In fact, the jury's recommendation of a life sentence for the death of Joe Norman shows the jury did consider the mitigating evidence to some degree. The evidence of Willoughby's guilt and the brutal nature of Willoughby's crimes was also overwhelming. As such, the Kentucky Supreme Court correctly concluded that the prosecutor's comments did not constitute prejudicial error.

## Claim 6 – Ineffective Assistance of Counsel

As his final ground for habeas relief, Willoughby argues that his trial counsel provided ineffective assistance under the standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Willoughby raised this claim with the Fayette Circuit Court in his Cr. 11.42 motion, and then on appeal to the Kentucky Supreme Court. It was denied at each stage of the state post-conviction proceedings.

Willoughby presented several challenges to his counsel's effectiveness as a single claim in his CR 11.42 proceeding. However, for convenience of the court, Willoughby presented the various challenges as three separate claims on appeal to the Kentucky Supreme Court. This Court will review each of those separate claims in turn.

### A.    Applicable Law

The Sixth Amendment guarantees criminal defendants the right to counsel, which protects the fundamental right to a fair trial. *Strickland*, 466 U.S. 668 (1984). For that

reason, the Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)). It is not enough for "a person who happens to be lawyer [to be] present at trial alongside the accused. *Id.*

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. To prevail on an ineffective assistance of counsel claim, the convicted defendant must set forth facts to satisfy a two-part test. *Id.* at 687.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

To prevail on the first prong of the *Strickland* test, the defendant must demonstrate that "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (*quoting Strickland*, 466 U.S. at 687). The Supreme Court has not articulated specific guidelines for appropriate attorney conduct "and instead [has] emphasized that 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Id.* (*quoting Strickland*, 466 U.S. at 688). The Court must also avoid second-guessing counsel's assistance after conviction . . ., "[as] it is all too easy for a court, examining counsel's defense after it proved to be

80

unsuccessful, to conclude that a particular act or omission was unreasonable." *Strickland*, 466 U.S. at 689. Counsel's performance shall not be judged with the "distorting effects of hindsight." *Id.* Instead, the Court must "reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct from counsel's perspective at the time." *Id.* In order to avoid the temptations of second-guessing, "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 131 S.Ct. 770, 787 (2011).

To satisfy the prejudice prong of the *Strickland* test, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The Supreme Court, however, has moved away from analyzing the prejudice prong purely from an outcome-determinative standpoint. In *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993), the Court emphasized that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." "To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle." *Id.* Rather, the reviewing courts should give attention to "whether the result of the proceeding was fundamentally unfair or unreliable." *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court has recently clarified that "[s]urmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "[T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington*, 131 S.Ct. at 788. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Id.*

On habeas review, the standard for establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is "all the more difficult." *Id.* In *Harrington v. Richter*, the Supreme Court recently emphasized the highly deferential standard for analyzing an ineffective-assistance claim on habeas review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's action were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (internal quotations omitted).

## B.    Sub-claim A: Ineffective assistance for calling  Dr. Schwartz to testify

Willoughby argues his counsel was ineffective for calling Dr. Charles Schwartz, a psychiatrist, to testify on his behalf during the guilt phase of his trial.   At the CR 11.42 hearing, Willoughby's counsel, Mr. Joe Jarrell, testified that he called Schwartz to testify about Willoughby's alleged intoxication at the time of his crimes.  He hoped the testimony would support either an intoxication defense or, at a minimum, provide mitigating evidence at sentencing.

Dr. Schwartz initially observed Willoughby to determine whether he was competent to stand trial. During the observation, Willoughby explained to Dr. Schwartz that he had consumed a number of drugs over the course of four or five days leading up to the murders. In a report to the trial court, Dr. Schwartz opined that Willoughby was competent to stand trial, and that Willoughby's use of drugs and alcohol leading up to the murders had not substantially impaired his level of consciousness or his cognitive faculties. Finally, Dr. Schwartz diagnosed Willoughby as having anti-social personality disorder.

Despite Dr. Schwartz's initial report, Jarrell made the decision to call the doctor to testify on Willoughby's behalf. As Jarrell explained at the CR 11.42 hearing, Jarrell provided the doctor with additional information subsequent to the competency report on Willoughby's drug consumption leading up to the murders. Based on conversations with the doctor, Jarrell believed that the doctor had changed his mind concerning Willoughby's cognitive abilities on the day of the murders.

On direct examination at trial, Dr. Schwartz testified that Willoughby exhibited symptoms of drug and alcohol withdrawal upon his arrest, and was treated for those symptoms. Dr. Schwartz also recounted a number of drugs that Willoughby said he took shortly before committing the murders. Finally, in an attempt to establish that Willoughby was still intoxicated at the time of the murders, Dr. Schwartz was asked two hypothetical questions on whether an individual would experience residual effects from consuming various combinations of drugs and alcohol over a four to five day period. He answered both questions affirmatively.

On cross-examination, the prosecutor asked Dr. Schwartz about his initial opinion on Willoughby's cognitive abilities on the day of the crime. Dr. Schwartz testified that he

had previously formed the opinion that Willoughby's cognitive abilities and level of consciousness on the day of the murders were not substantially impaired by the drugs and alcohol he consumed. The prosecutor also asked Dr. Schwartz about his report, wherein he opined that Willoughby had anti-social personality disorder. The prosecutor then asked Dr. Schwartz to generally discuss anti-social personality disorder. Dr. Schwartz explained that the disorder was very difficult to treat and involved characteristics such as lack of remorse and manipulative behavior.

At the CR 11.42 hearing, Jarrell admitted that Dr. Schwartz's testimony "wasn't as strong as [he] thought it was going to be on intoxication." (VE 2/11/98 9:22:40). Jarrell was aware of Dr. Schwartz's initial opinion that Willoughby's cognitive abilities were not substantially impaired, but Jarrell believed that Dr. Schwartz had since changed his mind. Jarrell admitted, however, that Dr. Schwartz "threw in" his diagnosis of Willoughby as a socio-path on the fly. Jarrell called the diagnosis a "surprise," which he had not seen in the medical reports.

Willoughby argues that Dr. Schwartz's testimony was particularly prejudicial to his other mitigating evidence, and that Jarrell was ineffective for calling the doctor to testify. According to Willoughby, even if the doctor would have changed his mind about Willoughby's intoxication, the prosecutor would have been able to impeach the doctor based on his initial report. Any expected benefit from the doctor's testimony would have therefore been lost on cross-examination. More importantly, Willoughby contends that Jarrell should not have been blind-sided by Dr. Schwartz' sociopath diagnosis because it was contained in his initial report, and that Willoughby should not have called Dr. Schwartz to prevent the diagnosis from being revealed to the jury.

## 1.    State Court Decision

The Kentucky Supreme Court adjudicated this claim on its merits, stating:

Willoughby argues that his counsel was ineffective because he called Dr. Charles Schwartz to testify during the guilt phase of the trial. Among the reasons he presents is that his counsel was a victim of burnout because of overwhelming caseload. The circuit judge decided against such a theory noting that, among other things, the testimony from defense counsel indicated that he had adequate time to prepare for the case. An examination of the record indicates that the caseload was lightened when he was assigned this case; that he had every afternoon available to work on the case; that he had exclusive use of an investigator; and that he went to the DPA offices to discuss the case and review their materials.

The allegations of the overload of cases must be considered in the context of the 1983 trial. Trial counsel indicated that it was much tougher to get experts in 1983 as compared to 1998. He was able to hire Dr. Robert Granacher who was a well known forensic psychiatrist frequently referred to as the "best in the field" with specific "expertise" in drug problems. Dr. Granacher had a reputation for being a good defense witness. Unfortunately for Willoughby, the testing done by Dr. Granacher did not yield favorable results. He was not called to testify, largely because he confirmed the conclusion of Dr. Schwartz that Willoughby suffered from antisocial personality disorder and that he could conform his conduct to the law on the day of the shootings. In addition, Dr. Granacher found no mental illness or biological condition that could be used as a defense.

It was not unreasonable for trial defense counsel to call Schwartz as a witness. No prejudice arose from the testimony on cross-examination regarding the personality disorder. The personality evidence was cumulative because Willoughby himself testified that he was discharged from the Navy because of "unsuitability, personality disorder." A second psychiatrist, Dr. Atcher, testified in the mitigation phase of the trial. He was cross-examined by the Commonwealth and also gave clinical information regarding the anti-social personality disorder.

At trial, Dr. Schwartz provided favorable testimony. The testimony of Dr. Schwartz regarding intoxication at the time of the arrest complimented testimony from Willoughby, law enforcement and jail personnel. Trial counsel admitted that the testimony of Dr. Schwarz regarding intoxication was not as strong as he had hoped as compared to the pretrial interview.

The contention that trial counsel overlooked the diagnosis of Dr. Schwartz regarding personality disorder is without merit. There is no doubt that counsel

realized that his client had personality problems. Moreover, Willoughby's mother also testified that she gave defense counsel the Navy discharge paperwork which reflected some personality disorders.

The mere fact that the Schwartz testimony was not as helpful as counsel may have hoped is not the basis for relief. Based on his analysis of the interview, trial counsel determined that Schwartz would give valuable testimony. Such a decision was reasonable and is particularly understandable insofar as the pretrial interview was more favorable than the testimony at trial.

Any complaint that defense counsel should be found ineffective simply because a witness does not ultimately testify as favorably as when that witness was interviewed prior to trial is not required by *Strickland*. Here, counsel reasonably investigated the entire matter and made a strategic choice to call the witness. He was not ineffective.

Defense counsel made a reasonable investigation and a strategically correct selection to call Dr. Schwartz in regard to the intoxication defense theory and mitigator in this case. It is not ineffective assistance simply because some of the testimony contains unfavorable information. *See Bunch v. Thompson*, 949 F.2d 1354 (4th Cir.1991).

*Willoughby v. Commonwealth*, Nos. 2005-SC-0115-MR, 2006 WL 3751392, at *3-4 (Ky. Dec. 21, 2006).

Willoughby argues that the Kentucky Supreme Court's decision was an unreasonable determination of the facts, entitling him to relief under § 2254(d)(2). Additionally, Willoughby asserts that the decision was an unreasonable application of *Strickland* and he is, therefore, entitled to relief under § 2254(d)(1). The Court will address each claim of error in turn.

## 2. Unreasonable determination of facts

Willoughby has established by clear and convincing evidence that the Kentucky Supreme Court made an unreasonable determination of fact in light of the evidence presented at the CR 11.42 hearing. The Kentucky Supreme Court stated:

The contention that trial counsel overlooked the diagnosis of Dr. Schwartz regarding personality disorder is without merit. There is no doubt that counsel realized that his client had personality problems. Moreover, Willoughby's mother also testified that she gave defense counsel the Navy discharge paperwork which reflected some personality disorders.

*Willoughby*, 2006 WL 3751392, at *4.

The Kentucky Supreme Court's finding is in conflict with Jarrell's testimony at the CR 11.42 hearing. Jarrell testified that he was surprised when Dr. Schwartz' testified that he diagnosed Willoughby as a sociopath. Jarrell explained that he had not seen that diagnosis in any report nor had Dr. Schwartz mentioned the diagnosis during their discussion. As Jarrell stated, "[Dr. Schwartz] threw it in" on the stand. (VE 2/11/98 9:22:40). This testimony directly conflicts with the Kentucky Supreme Court's finding that "[t]he contention that trial counsel overlooked the diagnosis of Dr. Schwartz regarding personality disorder is without merit." *See Willoughby*, 2006 WL 3751392, at *4.

Despite the Kentucky Supreme Court's unreasonable determination of fact, Willoughby is not entitled to habeas relief under § 2254(d)(2). Habeas relief is not warranted simply because the prisoner has established that the state court made a factual error. Instead, as the plain text of § 2254(d)(2) makes clear, the state court's adjudication must have been "based on" the unreasonable determination of facts. 28 U.S.C. § 2254(d)(2); *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) ("[I]t is not enough or the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination"); *see also Wiggins v. Smith*, 539 U.S. 510, 551-52 (2003) (Scalia, J. dissenting) (stating that § 2254(d)(2) requires that the unreasonable determination of facts be one on which the state-court decision was based). The Kentucky Supreme Court's

ultimate adjudication of this claim was not "based on" the factual error.

The factual error certainly played a role in Kentucky Supreme Court's decision on the first prong – deficient performance.  But the test under § 2254(d)(2) is whether the adjudication of the *claim* was based on the factual error.  After finding that it was reasonable for counsel to call Dr. Schwartz, the Kentucky Supreme Court moved on to consider whether Willoughby met the second prong of the *Strickland* test.  The court found that Dr. Schwartz's testimony was cumulative of other evidence presented at trial and, therefore, Willoughby was not prejudiced by the doctor's testimony.  Even if the state court had correctly concluded that Jarrell was not aware of Dr. Schwartz' sociopath diagnosis, that fact would have had no bearing on the prejudice prong.  As a result, it cannot be said that the Kentucky Supreme Court's decision was "based on" an unreasonable determination of facts under  § 2254(d)(2).

### 3. Unreasonable application of federal law

The Kentucky Supreme Court did not unreasonably apply clearly established federal law in concluding that Willoughby was not prejudiced by his counsel's decision to call Dr. Schwartz to testify.  As the Kentucky Supreme Court appropriately held, Dr. Schwartz provided favorable testimony on direct examination.  He testified that Willoughby was treated for symptoms of drug and alcohol withdrawal shortly after his arrest.  The doctor also testified that Willoughby told him about his heavy drug use leading up to the murders, which included use of cocaine and tussionex in combination with alcohol.  Finally, the doctor verified that a person of Willoughby's size who heavily consumed drugs and alcohol over four or five days would suffer residual intoxication for a period of time.  This testimony corroborated Willoughby's own testimony about his drug use and supported his intoxication

defense.

Willoughby contends that the positive effects of this testimony were entirely lost on cross-examination. Specifically, Willoughby points to Dr. Schwartz' testimony regarding his initial opinion of Willoughby's cognitive faculties at the time of the murders. Dr. Schwartz confirmed that he initially opined that Willoughby's cognitive faculties were not substantially impaired on the day of the murders by his consumption of drugs and alcohol. This testimony was certainly not favorable to Willoughby's intoxication defense. However, in analyzing this ineffective assistance claim, the Court must not consider whether Willoughby might have been more successful on his intoxication defense had Dr. Schwartz not testified. *See Lockhart*, 506 U.S. at 842. Instead, the question is whether the testimony rendered Willoughby's trial fundamentally unfair or unreliable. *Id.* Willoughby has not addressed that specific question. Although Dr. Schwartz's testimony was not as strong as Willoughby hoped, counsel had good reason to call the doctor to testify in furtherance of the intoxication defense, and the doctor did provide some favorable testimony on the matter. The fact that Dr. Schwartz was effectively cross examined does not alter that fact. Therefore, the Court cannot say that the Kentucky Supreme Court unreasonably applied federal law in concluding that this testimony did not render Willoughby's trial fundamentally unfair.

Willoughby also challenges the Kentucky Supreme Court's conclusion that his trial was not rendered fundamentally unfair by Dr. Schwartz's testimony that Willoughby was a sociopath. The Kentucky Supreme Court held that this evidence was cumulative to other evidence offered at trial, including Willoughby's own testimony that he was discharged from the Navy because of "unsuitability, personality disorder," and was therefore not prejudicial.

89

"Cumulative evidence" is defined as "additional evidence that supports a fact established by existing evidence." Black's Law Dictionary 596 (8th ed. 1999). Willoughby did, in fact, testify that he was discharged from the Navy for "unsuitability, personality disorder," though he did not discuss the exact nature of the personality disorder. While Dr. Schwartz's diagnosis that Willoughby was a sociopath was more specific than Willoughby's testimony, reasonable jurists could certainly disagree whether Dr. Schwartz's testimony was cumulative. Therefore, the Court cannot say that the Kentucky Supreme Court unreasonably applied clearly established federal law.

The Kentucky Supreme Court's decision that Dr. Schwartz's testimony was cumulative is supported by other evidence introduced at trial, though not specifically mentioned by the Kentucky Supreme Court. Dr. Schwartz's report, containing his opinion that Willoughby was a sociopath, was already in the record at the time he testified. The report had been admitted through a prior witness as part of Willoughby's Detention Center Infirmary medical records.[10] Dr. Schwartz's testimony was undoubtedly cumulative to his report, and Willoughby has not challenged that the report was improperly admitted into evidence. Even if Dr. Schwartz had not testified, his opinion that Willoughby was a sociopath was already before the jury. As a result, it was both reasonable and proper for the Kentucky Supreme Court to conclude that Dr. Schwartz's testimony was cumulative to other evidence introduced at trial. The Kentucky Supreme Court, therefore, reasonably applied federal law in holding that Willoughby's trial was not rendered fundamentally unfair by Dr. Schwartz's testimony.

---

[10] Willoughby admits in his habeas petition that Dr. Schwartz's report was already admitted as evidence when he testified. (Doc. # 7 at 70).

None of the cases cited by Willoughby compel a different result.  Willoughby relies on *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001), a case in which the Seventh Circuit found that counsel provided ineffective assistance by calling a psychologist to testify that the defendant was incapable of the kind of violence that had been perpetrated against the victim, which opened the door for the prosecution to discuss the defendant's prior kidnaping, rape and sodomy convictions.   The Seventh Circuit's decision has since been vacated by subsequent order, *Miller v. Anderson*, 268 F.3d 485 (7th Cir. 2001), and, therefore, provides no precedential value.

Willoughby's reliance on *Freeman v. Class,* 95 F.3d 639 (8th Cir. 1996) is likewise misplaced.   In *Freeman*, defense counsel introduced a police statement which contained hearsay evidence suggesting that the defendant stole a vehicle.  *Freeman*, 95 F.3d at 642-43.  There was little other evidence to establish that the defendant was guilty of the crime. The Eight Circuit found that defense counsel's conduct was both unreasonable and prejudicial because "there [was] reasonable probability that, absent this error, the jury would have had reasonable doubt respecting Freeman's guilt."  *Id.*

Unlike the evidence admitted in *Freeman*, Dr. Schwartz's testimony did not add anything that was not already in the record.  As previously stated, Dr. Schwartz's report was already in the record when he testified.   Willoughby has not objected to the admissibility of the report.   Within that report, Dr. Schwartz opined that Willoughby's cognitive abilities were not substantially impaired by his intoxication, and that Willoughby was a sociopath.  Thus, unlike *Freeman*, other admissible evidence established the same facts that Dr. Schwartz's testified to.

*Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), another case cited by Willoughby, is also inapposite. In *Combs*, defense counsel called an expert to testify that the defendant was too intoxicated to form the intent to kill. *Combs*, 205 F.3d at 288. The expert testified that the defendant was intoxicated, but that he also could form the intent to kill. *Id.* The Sixth Circuit found it objectively unreasonable that defense counsel did not fully investigate the expert's opinion before calling him to the stand, and found the testimony prejudicial because it single-handedly negated all other intoxication evidence.

In contrast to *Combs*, Willoughby's counsel, Mr. Jarrell, did investigate Dr. Schwartz's opinion on a possible intoxication defense. Though Dr. Schwartz originally opined that Willoughby was not substantially impaired, subsequent conversations with Dr. Schwartz led Jarrell to believe he had changed his mind. Counsel in *Combs* did not take this precaution. Moreover, *Combs* provides little support for the assertion that the trial was rendered fundamentally unfair by Dr. Schwartz's testimony on his psychological diagnosis of Willoughby. Although the evidence was damaging to Willoughby, unlike *Combs*, the evidence was already properly before the jury and Dr. Schwartz's testimony was merely redundant.

In the end, Willoughby has not established, nor does the Court find that the Kentucky Supreme Court's decision was an unreasonable application of clearly established federal law. Willoughby is not entitled to habeas relief on this sub-claim

### C.    Sub-claim B:    Ineffective assistance for failing to investigate and present mitigating evidence

Willoughby argues that his counsel failed to properly investigate and present readily-available mitigating evidence. More particularly, Willoughby contends that his counsel

should have documented a social history, which would have included school records, military records, mental health records, records of prior offenses, prison records, and medical records. By failing to investigate and present this social history, Willoughby asserts that his counsel failed to meet the prevailing professional norms as outlined in the American Bar Association's standards for counsel in death penalty cases. Willoughby contends that counsel's allegedly inept investigation deprived him of a fair trial because it prevented the jury from considering relevant mitigating evidence which would have likely caused at least one juror to reach a different sentencing verdict.

### 1.    State Court Decision

The Kentucky Supreme Court denied this claim on the merits, stating:

Willoughby now contends that his defense counsel inadequately prepared and investigated the mitigation phase of the case. He alleges that defense counsel did not begin preparing for mitigation until conviction and that he did not investigate the defendant's life history.

Willoughby asserts that his attorney inadequately investigated and prepared the mitigation case. His complaint is based almost entirely on part of an answer from the ineffectiveness hearing. He argues that trial counsel testified that he did not begin to prepare for mitigation of penalty in Willoughby's trial until after the jury convicted. This statement was taken out of context in argument and ignores other parts of the testimony by trial counsel. The record clearly demonstrates that this contention is without merit. Defense trial counsel's statement was in effect that he placed as much mitigation evidence as possible into the guilt phase. As noted in *Harper v. Commonwealth*, 978 S.W.2d 311 (Ky.1998), when a jury sits in both phases of a capital murder trial, all evidence introduced in the guilt phase may be considered by the jury during the penalty phase. Trial counsel observed that his goal in the case was first to get a sentence less than death. In his four previous capital cases, this strategy had been successful. In 1983, it was a common practice to introduce mitigation evidence in this manner. It should be obvious that trial counsel did not wait until the penalty phase to prepare for the mitigation of the penalty. There is no basis for an ineffective assistance of counsel claim.

Evidence was presented in both the penalty and mitigation phases in regard to intoxication, self-defense, emotional disturbance, mental state/depression,

youth, remorse, good family and lack of sleep. A careful examination of the record indicates that the defense counsel at trial put forth one of the best possible mitigation cases that was available to him.

Willoughby also maintains that additional mitigation evidence should have been presented. The majority of the alleged additional evidence is from interview summaries attached to the CR 59.05 motion after the denial of the RCr 11.42 motion. As such, the motion did not present a proper basis for a grant of relief pursuant to CR 59.05. *See Gullion v. Gullion*, 163 S.W.3d 888 (Ky.2005). The witness summaries were comprised essentially of communications to DPA counsel, all without the benefit of cross-examination or any analysis as to the potential unfavorable testimony within the summaries. These summaries were not presented at the RCr 11.42 hearing and do not indicate any misdeed by defense trial counsel in not presenting these witnesses. *See Tinsley v. Million*, 399 F.3d 796 (6th Cir.2005). The so-called life history documents were also simply attached to the CR 59.05 motion and never presented at the RCr 11.42 hearing.

We must conclude the trial counsel was not ineffective in presenting mitigating evidence. Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. *Wiggins v. Smith*, 539 U.S. 510 (2003).

A reasonable investigation is not one that the best defense lawyer blessed with not only unlimited time and resources, but also the inestimable benefit of hindsight would conduct. *See Baze v. Commonwealth*, 23 S.W.3d 619 (Ky.2000). In any event, decisions relating to witness selection are normally left to the judgment of counsel and will not be second-guessed by hindsight. *See Foley v. Commonwealth*, 17 S.W.3d 878 (Ky.2000); *Morrow*, 977 F.2d at 222. The true test is whether the performance by defense counsel is so deficient that it renders the result unreliable. *See Darden v. Wainwright*, 477 U.S. 168 (1986).

Here, the evidence claimed by Willoughby as additional mitigation was cumulative to the central mitigation issues. Presentation of a social life history would have created not only duplicitous and cumulative evidence. Defense trial counsel was not deficient in his performance and was not ineffective in the investigation and presentation of mitigation evidence.

*Willoughby*, 2006 WL 3751392, at *4-5.

Willoughby argues that the Kentucky Supreme Court erred in two respects, each of which provide an independent basis for habeas relief. First, Willoughby asserts that he is entitled to relief under § 2254(d)(2) because the court made an unreasonable determination of facts in concluding that portions of the additional mitigating evidence was cumulative. Second, Willoughby contends the Kentucky Supreme Court unreasonably applied *Strickland* in holding that defense counsel was not ineffective in presenting mitigating evidence. As explained below, neither of Willoughby's contentions have merit.

## 2. Unreasonable determination of facts

Willoughby contends that the Kentucky Supreme Court made an unreasonable determination of fact in denying this claim. During his post-conviction proceedings, Willoughby presented additional mitigating evidence that he argues his counsel should have presented at trial. The Kentucky Supreme Court found that the additional mitigating evidence was "cumulative to the central mitigating evidence." *Willoughby*, 2006 WL 3751392, at *5.

Willoughby asserts that this finding is unreasonable in two principal ways. First, there was limited evidence about the depth and severity of his psychological problems introduced at trial. However, at Willoughby's CR 11.42 hearing, Dr. Peter Schilling, a psychologist, testified about Willoughby's various "mental deficits," as Willoughby has described them. Of particular importance, Schilling testified that Willoughby had been tested to have an I.Q. of 79 when he was nine years old, which placed Willoughby in the borderline range of intelligence. Schilling also stated that Willoughby had been discharged from the Navy for enuresis or bed-wetting. Finally, Schilling opined that Willoughby suffered from Attention Deficit Hyperactivity Disorder. According to Willoughby, none of

these facts were introduced at trial and could not have been cumulative of other mitigating evidence.

Willoughby also argues that no evidence of his good behavior as an inmate was introduced at trial. During post-conviction proceedings, Willoughby presented records from the Kentucky Correctional Psychiatric Center which made some favorable statements. In particular, Willoughby points to a Progressive Incarceration Plan, dated October 31, 1979, which gave Willoughby a "glowing recommendation." According to Willoughby, the report indicated that he was "such a good inmate/employee at the Horse Park that the Deputy Commissioner of Kentucky Parks would not have hesitated hiring him." (Doc. # 7 at 23). Because none of this mitigating evidence was introduced at trial, Willoughby asserts that the Kentucky Supreme Court erred in finding that the evidence was cumulative.

Neither of these arguments demonstrate by clear and convincing evidence that the Kentucky Supreme Court made an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d)(2). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Willoughby has failed to meet this higher standard because evidence similar to Dr. Schilling's testimony and the Progressive Incarceration Plan was offered at trial.

At the CR 11.42 hearing, Dr. Schilling offered specific details about Willoughby's low I.Q. and learning disabilities. Similar evidence was offered at trial. Willoughby's mother testified that he was "slow to learn" and that "his IQ was below average." (TE 2347, 2350). Dr. Schilling also opined during the CR 11.42 hearing about the reason why Willoughby was discharged from the Navy. However, this was also explained at trial. Willoughby

testified that he was discharged for "unsuitability, personality disorder" after the Navy conducted a battery of psychological tests on him.[11] (TE 1906). Although every detail of mitigation evidence offered by Dr. Schilling at the 11.42 hearing was not introduced at trial, the evidence was sufficiently similar to that offered at trial such that this Court cannot say the Kentucky Supreme Court unreasonably determined that the evidence was cumulative.

Likewise, character evidence in the Progressive Incarceration Plan was duplicitous to character evidence offered at trial. Although there was no evidence offered at trial about Willoughby's character while incarcerated, several witnesses testified that Willoughby exhibited similar characteristics throughout his life. For example, the Progressive Incarceration Plan praised Willoughby as a "good inmate" and extolled his work ethic. At trial, several witnesses, including Willoughby, testified that he worked extensively in carpentry, setting tile and remodeling. Susan Hutchens and Ray Penrod both praised Willoughby's work ethic. In fact, Penrod described Willoughby as "an awful good worker." (TE 1246). Other witnesses described Willoughby as "cooperative with anybody," would "help any body out," "never [try] to start no trouble," showed "no meanness," "very loving," and a good friend, among many other positive qualities. (TE 2356-2357, 2353). This testimony was certainly consistent with the evidence in the Progressive Incarceration Plan about Willoughby's character. As a result, the Kentucky Supreme Court reasonably found that this evidence was cumulative to other mitigation evidence offered at trial. Willoughby is not entitled to habeas relief under § 2254(d)(2) on this claim.

---

[11] In fact, Dr. Schilling's explanation for Willoughby's discharge is in direct conflict with Willoughby's own explanation. Dr. Schilling opined that Willoughby was discharged because of enuresis or bed-wetting. Willoughby, however, explained that he was discharged for "unsuitability, personality disorder."

### 3.    Unreasonable application of federal law

Willoughby also argues that the Kentucky Supreme Court erred in holding that trial counsel was not ineffective in preparing for the mitigation phase of his trial.  The Kentucky Supreme Court addressed the effective representation prong of the *Strickland* test at length; it is, therefore, entitled to deferential review under § 2254(d)(1).  However, because the Kentucky Supreme Court did not address the prejudice prong of *Strickland*, the Court must review that prong *de novo*.  *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*.").

Willoughby contends that his counsel was ineffective because he spent little time preparing for the mitigation phase of the trial, and because he failed to thoroughly investigate and offer details about Willoughby's psychological and mental struggles, his poor performance in school, and his prior correctional experience.   Willoughby acknowledges that counsel presented some evidence about most of these topics, but he argues that counsel failed to fully develop these areas of mitigation.   According to Willoughby, "[t]he jury knew [he] was a slow learner but not how slow.  The jury knew he was depressed.  The jury knew he was discharged from the Navy but not the reason why, and that he was in a car accident."  (Doc. # 7 at 75).  However, Willoughby contends that because counsel did not access many available records, "counsel was unable to present and explain to the jury the significance of all the available mitigation evidence."  (*Id.* at 76). In light of these alleged investigative shortcomings, Willoughby asserts that his counsel provided constitutionally ineffective assistance and that the Kentucky Supreme Court

unreasonably applied clearly established federal law in holding to the contrary.

"Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is 'well-established.'" *Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005) (*quoting Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir. 2001)). Where the defendant challenges that counsel's investigation was incomplete, as Willoughby asserts here, the relevant inquiry is whether "reasonable professional judgment support[ed] the limitation on investigation." *Strickland*, 466 U.S. at 690-91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary." *Id.* at 691.

The American Bar Association's standards for capital defense work provides a guide to determining whether an investigation was reasonable. *Wiggins*, 539 U.S. at 524. Those standards "provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* (*quoting* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1©, p. 93 (1989) (emphasis added)). Areas of investigation should include medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influence. *Id.* (*citing* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p. 133).

While the ABA guidelines provide a metric by which counsel's investigation may be judged, the Supreme Court reminds that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005). Instead, the investigation, and decision to not pursue a line

of investigation must be reasonable. *Strickland*, 466 U.S. at 691. "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998).

Applying the doubly deferential standard of *Strickland* and AEDPA, Willoughby has not shown that the Kentucky Supreme Court unreasonably applied federal law in holding that his counsel was not ineffective in investigating and presenting mitigating evidence. As he argued to the Kentucky Supreme Court, Willoughby begins his argument by asserting that his counsel spent inadequate time preparing for the mitigation phase. He bases this argument on counsel's admission during the CR 11.42 hearing that he did not begin preparing for the sentencing phase of trial until the guilt phase was completed. However, as the Kentucky Supreme Court recognized, Willoughby takes his counsel's admission out of context. Willoughby apparently attempts to equate *preparation* with *investigation*. As Willoughby's counsel, Mr. Jarrell, explained he did not begin to think about "outlining" his sentencing-phase case until after the guilt phase. But Jarrell also explained that he presented as much mitigation evidence as possible during the guilt phase. This demonstrates that Jarrell began investigating mitigation evidence long before the guilt phase ended.

Willoughby's second point of contention is that Jarrell failed to fully investigate and present evidence on his psychological problems, struggles in school, prior behavior as an inmate, and good work ethic. The question, though, is not whether Jarrell exhaustively investigated these areas, but whether he conducted a reasonable investigation and made a reasonable decision to investigate no further. *Strickland*, 466 U.S. at 691.

Jarrell did investigate and present evidence about Willoughby's psychological problems. For example, Willoughby testified that he was discharged from the Navy for "unsuitability, personality disorder," and described his struggle with depression, which included feelings of sadness, hopelessness and like "nothing matters no more. (TE 1906, 1909). Willoughby also described extensive drug and alcohol use, which clouded his perception and caused him to lose sleep. This testimony was verified by several witnesses, including Marsha Willoughby, Susan Hutchens, Leif Halvorsen, Dr. Charles Schwartz, and jail personnel.

Jarrell also discussed Willoughby's psychological condition with two doctors. Dr. Charles Schwartz verified that Willoughby suffered from depression and insomnia (TE 1858-1859), but opined that Willoughby was also competent to stand trial. Willoughby's family also gathered enough resources to hire Dr. Robert Granacher, a forensic psychologist, to conduct psychological tests on him. Jarrell chose Dr. Granacher because he had a reputation for being a favorable defense witness. However, after conducting a full day of testing, Dr. Granacher advised Jarrell that he would not be a favorable witness at trial. Dr. Granacher believed that Willoughby had anti-social personality, found no illness or biological condition that could be used as a defense, and found that Willoughby had a lower I.Q. but was not mentally retarded.

Willoughby contends that meeting with two doctors was not enough. According to Willoughby, Jarrell also should have gathered records from the Kentucky Correctional Psychiatric Center ("KCPC"), which provided further details about his psychological problems. In addition, Willoughby contends that Jarrell should have met with and called a psychologist from KCPC to testify in furtherance of the records. The records were

generated as part of a previous criminal proceeding involving Willoughby. They stated that Willoughby's overall functioning was in the dull-normal range with verbal abilities in the borderline mentally retarded range. The records also described him as being mildly non-conformist, and having difficulty controlling his temper at times. Finally, the records explained that Willoughby suffered from headaches as a result of a car accident, which made it difficult for him to concentrate and caused him to smoke marijuana to relieve the pain. These records, according to Willoughby, were readily available and would have provided favorable mitigation evidence.

Despite the "readily available" nature of these records, the Kentucky Supreme Court did not unreasonably apply federal law in concluding that Jarrell made a reasonable decision to investigate Willoughby's psychological condition no further. Jarrell sought the advice and expert assistance of a psychologist known within the Fayette County legal community to be a favorable defense witness. That psychologist opined that Willoughby did not suffer from a psychological condition or diminished intelligence that would support a viable defense at trial. This opinion gave Jarrell "good reason to think further investigation would be a waste of time." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (*citing Wiggins v. Smith*, 539 U.S. at 525 (holding that further investigation excusable where counsel has evidence suggesting it would be fruitless)). As such, it was reasonable for him to investigate no further.

Additionally, neither of the cases cited by Willoughby to support this claim compel a different conclusion. In *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995), the Sixth Circuit found that counsels' representation was ineffective because they *entirely* failed to present "information on [the defendant's] history, character, background and organic brain

damage." *Id.* at 1207. Defense counsel completely failed to present any evidence describing the defendant as "slow," or having an I.Q. score that placed him "within the Mental Defective range," or any other similar evidence, although it was readily available. *Id.* at 1208. Defense counsel also failed to present any evidence on the defendant's brain damage. *Id.*

*Harris ex rel Ramseyer v. Wood*, 64 F.3d 1432 (9th Cir. 1995), another case cited by Willoughby, is much like *Glenn*. In that case, defense counsel *entirely* failed to prepare a social history, interview witnesses, and only interviewed three of thirty-two people mentioned in the police report. *Id.* at 1436. Counsel also completely failed to investigate the defendant's mental and emotional status, including his capacity to commit the crime and competence to stand trial. *Id.*

*Glenn* and *Harris ex rel Ramseyer*, however, are distinguishable from the present case. Willoughby's counsel did investigate and present mitigation evidence on Willoughby's psychological problems. Counsel also had Willoughby evaluated for his competency to stand trial and capacity to commit the crime. During that investigation, one doctor opined that he was competent to stand trial. Most importantly, he did not pursue additional evidence after two doctors opined that Willoughby did not have a mental defect that would serve as a defense or mitigation evidence. Accordingly, Willoughby is not entitled to habeas relief based on his counsel's alleged failure to investigate the KCPC records or interview the psychologist from KCPC.

Willoughby also contends that Jarrell should have more thoroughly investigated his low intelligence. There is no dispute that Jarrell investigated and presented evidence about Willoughby's low intelligence to some extent. Willoughby's mother testified that Willoughby

was "slow to learn" in school, but that he also graduated from high school. (TE 2347). She also explained that Willoughby's "IQ was below average and he had trouble coping." (TE 2350). Willoughby contends that Jarrell should have done more investigation into his low intelligence. According to Willoughby, Jarrell should have discovered that he graduated last in his high school class, he had an I.Q. of 79, and he had previously been found to be borderline mentally retarded. Willoughby suggests that this information was readily discoverable as part of his school records.

The Kentucky Supreme Court did not unreasonably apply federal law in holding that Jarrell's investigation into Willoughby's level of intelligence was reasonable, as was his decision to investigate the issue no further. Discussions with Willoughby's mother revealed that Willoughby had a low level of intelligence, and Willoughby's mother was willing to testify to that fact. While it would have been helpful to quantify Willoughby's intelligence, it was reasonable for Jarrell to believe that the mother's testimony was just as strong as any evidence that might have been gleaned from school records.

Finally, Jarrell investigated and offered extensive evidence about Willoughby's good character and work ethic. That evidence has already been described at length by the Court. Willoughby contends that Jarrell should have investigated each of these areas further by talking to his father and co-workers, and by requesting his prior prison records. However, as previously explained, Jarrell called multiple witnesses to the stand, and asked other witnesses on cross-examination, about Willoughby's strong work ethic. Similarly, other witnesses talked about Willoughby's character, describing him as "very loving" and having "no meanness," among other positive attributes. All of this information gave Jarrell a strong understanding of Willoughby's character and reputation, and none of this

information led him to believe that he would continue to find more favorable information. It was thus reasonable for the Kentucky Supreme Court to conclude that Jarrell did not provide ineffective assistance by  failing to investigate further.

Willoughby has cited several cases from other Circuits for the proposition that counsel's failure to introduce prior prison records demonstrating good behavior amounts to ineffective assistance. Only one of those cases, *Martinez-Macias v. Collins*, appears to reach such a bright-line holding.  810 F. Supp. 782, 787 (W.D. Tex. 1991), *aff'd*, 979 F.2d 1067 (5th Cir. 1991).  *But see Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) (holding that counsel was ineffective for failing to put on any mitigation whatsoever based on the misunderstanding that mitigation evidence was only appropriate in gruesome cases involving torture), *and Eutzy v. Dugger*, 746 F. Supp. 1492, 1497 (N.D. Fl. 1989), *aff'd*, 912 F.2d 1468 (11th Cir. 1990)  (holding that counsel was ineffective for failing to present any mitigation evidence to include favorable jail records).   However, under AEDPA, the Kentucky Supreme Court's decision is not measured against the holding of the Fifth or Eleventh Circuit Courts of Appeal.   Instead, the decision is to be considered in light of clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).   The Supreme Court has held that a defendant has a right to present testimony about his good behavior while incarcerated and awaiting sentencing as mitigation evidence.  *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986).  However, the Court has never clearly established that counsel is ineffective for failing to investigate and present such evidence.   The inquiry continues to be guided by the objective reasonableness standard.  *See Bobby v. Van Hook*, 558 U.S. 4, 6 (2009) ("The Sixth Amendment entitled criminal defendants to the 'effective assistance of counsel'–that is, representation that does

not fall 'below an objective standard of reasonableness' in light of 'prevailing professional norms.' That standard is necessarily a general one."). Applying that standard, the Kentucky Supreme Court did not unreasonably apply clearly established federal law in holding that counsel was not ineffective for failing to investigate and present the prison records.

Finally, Willoughby argues that Jarrell was ineffective in presented nothing more than a "hollow shell" of mitigation testimony about his background. Willoughby compares Jarrell's presentation of mitigation evidence to the evidence presented in *Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999), where the Eleventh Circuit found that defense counsel provided ineffective assistance. In that case, defense counsel called eight witnesses to testify during the sentencing phase. *Id.* at 1201. However, the Eleventh Circuit found that "their examination of the witnesses was minimal." *Id.* "[W]ith respect to a number of witnesses, counsel only sought their opinion of [the defendant's] reputation for truth and veracity – a matter wholly irrelevant to the issue before the jury." *Id.* The Eleventh Circuit concluded that counsel "presented no more than a hollow shell of testimony necessary for a particularized consideration of relevant aspects of the character and record of a convicted defendant before the imposition upon him of a sentence of death." *Id.* at 1201-02 (internal quotations omitted).

Unlike counsel in *Collier*, Jarrell presented wide-ranging and detailed mitigation evidence. Aside from the mitigation testimony already discussed, Jarrell also presented extensive testimony on Willoughby's intoxication at the time of the murders. Willoughby himself testified that he consumed numerous drugs and copious amounts of alcohol in the days leading up to the murders. Jarrell called Dr. Schwartz to corroborate Willoughby's

testimony about drug and alcohol use, and describe Willoughby's symptoms of withdrawal shortly after his arrest. Other witnesses, including jail personnel and Willoughby's investigator, were called by Jarrell to describe Willoughby's symptoms of withdrawal.

Jarrell also presented extensive evidence to support the theory that Willoughby acted in self defense against Joe Norman. Jarrell asked Willoughby multiple questions about Joe Norman's bad temper, his history of making belittling comments, and repeated failure to pay Willoughby for work performed. Willoughby also testified that Norman had physically threatened and pushed him in the past. Jarrell asked other witnesses, including Susan Hutchens and Wilhemena Thompson, to verify Norman's abusive tendencies. They described Norman as a bully who made Willoughby redo work for no reason, and who often failed to pay Willoughby for work performed. With all of this background information, Jarrell asked Willoughby to describe his confrontation with Norman shortly before he was killed. Willoughby explained that Norman pushed him as they argued, and then he grabbed a bayonet and told Willoughby he would "cut his heart out."

Ultimately, Jarrell presented wide-ranging and thorough mitigation evidence during both the guilt and sentencing phase. He may not have uncovered every favorable record, as Willoughby points out. However, applying the doubly deferential standard of AEDPA and *Strickland*, the Court cannot say that the Kentucky Supreme Court unreasonably applied clearly established federal law in concluding that Jarrell's investigation and presentation of mitigation evidence was reasonable. Thus, Willoughby is not entitled to habeas relief on this claim.

**D.      Sub-Claim C: Ineffective assistance in providing retained expert with necessary records**

Willoughby also contends that his counsel was ineffective for failing to provide his retained expert, Dr. Robert Granacher, with important life history records, which prevented the doctor from rendering an accurate psychological assessment.  As previously stated, Willoughby retained Dr. Granacher at the advice of Jarrell to provide a psychological assessment.  Dr. Granacher was known to be a favorable defense witness within the Fayette County legal community.  After a day of observation, Dr. Granacher found that Willoughby was a sociopath and that he did not have a mental disease or defect that would support a viable defense.  Because Dr. Granacher's assessment was not favorable to Willoughby, Jarrell chose not to call him to testify at trial.

Willoughby asserts that Dr. Granacher would have reached a different conclusion had a he been provided with readily available information, including education, health and military records.  To develop this claim, Willoughby relies on the testimony of Dr. Peter Schilling, a psychologist, who testified at the CR 11.42 hearing.  After reviewing all of the records and conducting various psychological evaluations, Dr. Schilling diagnosed Willoughby with Attention Deficit Hyperactivity Disorder ("ADHD").  Dr. Schilling explained that people with ADHD are inattentive and impulsive.  Willoughby argues that this diagnosis would have been important to his defense and mitigation theory because it established that he had a "lessened ability to conform his conduct to the law and a lessened moral culpability for his actions."  (Doc. # 7 at 85).  Additionally, Willoughby points out that Dr. Schilling did not find that he was a sociopath.

1.    **State court decision**

The Kentucky Supreme Court adjudicated this sub-claim on its merits, addressing

both the ineffective assistance and prejudice prong of the *Strickland* test.  The Kentucky

Supreme Court stated:

> Willoughby complains that his trial counsel was ineffective in presenting expert testimony particularly by the failure to provide life history records to Dr. Granacher. Four psychological evaluations were performed on Willoughby. The claim is that deficient performance was obvious and that Willoughby was prejudiced because the jury never heard any of the mitigating evidence that could have been adduced in a competency report, such as the one rendered by Dr. Peter Schilling. The argument also relies on a summary of the testimony given by Stephen Bright, a lawyer and law professor.
>
> The Bright testimony regarding the reasonableness of defense counsel was offered generally. He never specified that the gathering of records to supply experts was a standard at the time of this trial. Actually, he acknowledged during his testimony that the ABA Guidelines he was using for his opinions were adopted in 1989, six years after Willoughby's trial. The effectiveness of defense counsel is considered based on the professional requirements in existence at the time of the trial. The fact that experts were found who would testify favorably as long as twenty years later in some cases, is irrelevant. *Horsely v. Alabama*, 45 F.3d 1486 (11th Cir.1995). Defense counsel does not perform unreasonably merely by not ruling out every possible psychological mitigator through specialized evaluations. *Carter v. Mitchell*, 443 F.3d 517 (6th Cir.2006). Here, the conclusion by Dr. Schilling involved an objective diagnosis model that was 14 years from existence at the time of the trial. This case is clearly distinguishable from *Bean v. Calderon*, 163 F.3d 1073 (9th Cir.1998). In the Bean case, the penalty phase was described as cursory and disorganized. In that case, counsel also ignored recommendations by two mental health professionals that had examined the accused in the early stages of the case and strongly recommended further testing to evaluate the organic brain damage suffered by Bean.
>
> None of the records were introduced at the RCr 11.42 hearing. The only evidence of their contents was based on statements made by defense counsel when questioning Bright and Dr. Schilling. Such records were available prior to the RCr 11.42 hearing and their contents should not be considered at this time.
>
> Under all the circumstances, the insufficient testimony of Bright, as well as the failure to introduce any of the records, is not a proper ground to

demonstrate that defense trial counsel was ineffective or deficient or that the outcome of the trial was in any way prejudiced.

*Willoughby*, 2006 WL 3751392, at *5-6.

Willoughby argues that the Kentucky Supreme Court's holding is erroneous. He contends that the court's "decision on attorney performance was an unreasonable application of *Strickland*," which entitles him to habeas relief under § 2254(d)(1). (Doc. # 7 at 86). Additionally, Willoughby argues that the Kentucky Supreme Court's decision was an unreasonable determination of fact, which entitled him to relief under § 2254(d)(2).

### 2.    Unreasonable determination of fact

Willoughby baldly asserts that the Kentucky Supreme Court's decision was based on an unreasonable determination of fact. However, he does not identify any purportedly erroneous factual findings. He does not even cite any facts developed in the state court proceedings that contradicts the Kentucky Supreme Court's factual findings. Nonetheless, having reviewed the state court record, the Court finds that the Kentucky Supreme Court made a reasonable determination of facts as it relates to this sub-claim. Therefore, Willoughby is not entitled to relief under § 2254(d)(2).

### 3.    Unreasonable application of federal law

Although Willoughby challenges the Kentucky Supreme Court's decision on both prongs of the *Strickland* analysis, his argument predominantly opposes the Kentucky Supreme Court's conclusion that his counsel provided adequate representation. During the CR 11.42 proceedings, Willoughby relied on both the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and the testimony of Professor Stephen Bright to establish the standard of performance in 1983. The Kentucky

Supreme Court refused to consider the standard set forth in the 1989 Guidelines because it found that counsel's performance at trial must be measured by standards at the time of trial. Similarly, the Kentucky Supreme Court held that Professor Bright testified generally about the prevailing standards of representation, but failed to specify whether those were the standards in 1983. For these reasons, the Kentucky Supreme Court refused to analyze counsel's performance under those standards.

Beginning in *Strickland v. Washington*, the United States Supreme Court has recognized that the ABA standards may serve as a guide to determining whether counsel's representation was reasonable. *Strickland*, 466 U.S. at 688-89; *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000). The ABA standards, however, are only a guide. *Strickland*, 466 U.S. at 688. The performance inquiry must focus on "whether counsel's assistance was reasonable considering all the circumstances." *Id.*

The Sixth Circuit has squarely addressed whether the 1989 ABA Guidelines serve as a guide to determining if counsel's performance in 1982 and 1983 was reasonable. *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995); *Hamblin v. Mitchell*, 354 F.3d 482, 488 (6th Cir. 2003). In *Hamblin*, the Sixth Circuit explained that counsel's performance must be measured against the prevailing standards of the time of the defendant's trial, which took place in 1983. *Id.* The *Hamblin* Court relied on the 1989 and 2003 ABA Guidelines "simply because they are the clearest exposition of counsel's duties at the penalty phase of a capital case, duties that were recognized by this court as applicable to the 1982 trial of the defendant in *Glenn v. Tate* . . . ." *Id.*

Pursuant to *Glenn* and *Hamblin*, the Kentucky Supreme Court may have erred in concluding that neither the 1989 ABA Guidelines nor Professor Bright's testimony, which

was consistent with the Guidelines, could serve as a guide to the reasonableness analysis. This potential error, though, does not entitle Willoughby to habeas relief under § 2254(d)(1).

The Kentucky Supreme Court correctly held that Willoughby failed to establish any prejudice based on his counsel's alleged failure to provide Dr. Granacher with all necessary records. Because this conclusion was correct, the Court will not analyze whether the Kentucky Supreme Court erred in concluding that counsel's performance was reasonable. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . It if is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

The crux of Willoughby's argument on prejudice is that Dr. Granacher would have rendered a "competent report," such as the report rendered by Dr. Schilling, if Jarrell would have provided all life history records to him. Dr. Schilling's diagnosis would have been favorable to Willoughby at trial because he found that Willoughby suffered from ADHD, which caused him to be impulsive and lack the ability to control his behavior. In addition, Dr. Schilling found that Willoughby was a submissive person who needed the support of a more dominant person. According to Willoughby, this opinion would have supported his theory that his co-defendant, Halvorsen, was more culpable. Finally, Willoughby notes that Dr. Schilling did not diagnosis him as a sociopath. Willoughby contends that he was prejudiced because Dr. Granacher did not provide a similar "competent report."

As *Strickland* instructs, Willoughby must demonstrate prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. In this specific

instance, Willoughby does not satisfy this burden by demonstrating that another doctor would have reached a more favorable diagnosis after reviewing all the necessary records. Instead, Willoughby must demonstrate that Dr. Granacher's opinion would have been different, and more favorable, had he been provided with all of the records. *See Honeycutt v. Roper*, 426 F.3d 957, 961-62 (8th Cir. 2005), *cert denied*, 547 U.S. 1180 (2006) (finding no prejudice where the defendant failed to show that the expert's opinion would have been different had he been provided complete medical records). Willoughby has not satisfied this burden.

Willoughby relies on the testimony of Dr. Schilling at the CR 11.42 hearing to demonstrate that Dr. Granacher would have diagnosed him with ADHD had he been provided with the records at issue. However, a close review of Dr. Schilling's testimony suggests that the records played no part in his *initial* ability to reach the diagnosis. Instead, Dr. Schilling testified that he reached this diagnosis based on objective testing. Before conducting that objective testing, Dr. Schilling explained that he had no reason to believe Willoughby suffered from ADHD. Dr. Schilling conducted a twelve-part intelligence test on Willoughby, which included three sub-tests designed to assess his ability to concentrate. Willoughby consistently underperformed on these tests of concentration. *After* this test, Dr. Schilling administered a "new rating scale," which he described as a state-of-the-art test in 1998. That test gave "incredibly strong confirmation" of his diagnosis. Only after conducting these two objective tests did Dr. Schilling consult Willoughby's school records for *additional* confirmation.

Based on this testimony, Willoughby has not shown a reasonable probability that Dr. Granacher would have diagnosed him with ADHD had he been provided the school

records.  It was the objective testing, not the school records, that allowed Dr. Schilling to initially uncover this mental disease.  The school records were only relevant to confirm the initial diagnosis.  While Willoughby has demonstrated that the school records played a role in the diagnosis, he has not shown that the absence of the records caused Dr. Granacher to miss this diagnosis.

Similarly, Dr. Schilling's testimony fails to demonstrate that Dr. Granacher would not have diagnosed Willoughby as a sociopath had he reviewed the records at issue. Willoughby places significant weight on the fact that Dr. Schilling did not diagnose him as a sociopath.  However, that is not enough to establish prejudice.  Dr. Schilling never explained the basis for this conclusion during the CR 11.42 hearing and thus failed to demonstrate that Dr. Schilling reached this conclusion based on the contents of the additional records.  As a result, Willoughby has failed to establish prejudice.

Finally, Willoughby has not demonstrated that Dr. Granacher would have found him to have a submissive personality, as Dr. Schilling opined, if he would have been provided the records at issue.  Dr. Schilling explained that he formed this opinion after looking at the objective data from tests he performed on Willoughby.  Dr. Schilling never suggested that the records at issue played any role in this diagnosis, and Willoughby has not otherwise demonstrated that the records would have led Dr. Granacher to the same diagnosis.

In the end, Willoughby has not demonstrated any prejudice by his counsel's failure to provide Dr. Granacher with medical, military, and education records, among other records.  There is no indication that any of those records would have caused Dr. Granacher to reach a different diagnosis.  While Dr. Schilling diagnosed Willoughby with conditions that would have been more favorable to his defense, those diagnoses were largely based

on objective testing rather than a review of the records at issue.

### E.     Cumulative Ineffectiveness

Although the Court has analyzed each of these sub-claims separately, "the clear mandate of *Strickland* and several other Supreme Court cases is that the effect of all counsel's errors is to be considered in toto, against the backdrop of the totality of the evidence in the case." *Mackey v. Russell*, 148 F. App'x 355, 368-69 (6th Cir. 2005). As the Court has already held, the Kentucky Supreme Court did not unreasonably apply federal law in holding that counsel was not ineffective in preparing for the mitigation phase of Willoughby's trial.   Therefore, the Court need not consider whether this alleged error, considered in toto with the other claims of error, prejudiced Willoughby.   *See Davis v. Lafler*, 658 F.3d 525, 538 (6th Cir. 2011) (where the state court reasonably applied federal law in holding there was no deficient performance, the federal habeas court is not required to review the prejudice prong).

The Court found that Willoughby was not prejudiced by his counsel's alleged ineffectiveness set forth his the first and third sub-claim – calling Dr. Schwartz to testify and providing Dr. Granacher with necessary records, respectively – when those claims were considered individually.  When those alleged errors are considered in toto, Willoughby has failed to demonstrate any cumulative prejudice.

In this case, the Commonwealth presented overwhelming aggravating evidence at trial.  In fact, Willoughby took the stand and admitted to shooting at least one of the victims. Two of the victims were innocent bystanders, killed because they were in the wrong place at the wrong time.  One of the innocent-bystander victims lied on the floor and moaned in pain from her gunshot wounds.  If the original gunshots were not bad enough, Willoughby

stoop atop the victim and shot her twice more.  Then, to cover up his crime, Willoughby and

his co-defendant loaded the victims' bodies into vehicles and attempted to throw them off

a bridge into a river.  One of the bodies was recovered from the river below.  The other two

bodies were found on the side of the bridge.  Each victim was bound by yellow-and-blue

rope that was attached to a heavy rock, presumably to ensure the bodies sunk to the

bottom of the river.  In short, there was overwhelming evidence that the Willoughby

committed a gruesome crime.  Willoughby has not demonstrated a reasonable probability

that the omitted evidence or keeping Dr. Schwartz from testifying would have changed the

conclusion that the aggravating circumstances outweighed the mitigating evidence and,

hence, the sentence imposed.  Therefore, Willoughby is not entitled to habeas relief on his

ineffective assistance of counsel claim.

## V.  CERTIFICATE OF APPEALABILITY

Under the AEDPA, an appeal from a denial of a writ of habeas corpus may not be

taken unless a circuit justice or judge issues a certificate of appealability.  See 28 U.S.C.

§ 2253.  Recently, in *Castro v. United States*, 310 F.3d 900 (6th Cir. 2002), the Sixth Circuit

held that a district court need not wait until a petitioner moves for a Certificate of

Appealability (hereinafter "COA") before issuing a COA for claims raised in the petition.

Because a district judge who has recently denied a writ of habeas corpus will have "an

intimate knowledge of both the record and the relevant law and could simply determine

whether to issue the certificate of appealability when she denies the initial petition," it

follows that a proper time to determine whether to grant a COA is at the conclusion of the

opinion granting or denying the writ.  *Id.* at 901 (internal quotation marks and citations

omitted).[12] Thus, in concluding this Opinion, it is now appropriate to determine whether to grant or deny a COA as to any of the claims Petitioner presented in his petition pursuant to 28 U.S.C. § 2253.

A COA may not issue unless "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.*

Applying this standard to the claims raised herein, and for the reasons set forth within the body of this Memorandum Opinion and Order, the Court concludes that because jurists of reason could debate the issues raised in Claims 1 and 5(1)(d) , the Court will issue a COA on those claims. The Court will not issue a COA for any of the other claims raised.

## VI. CONCLUSION

For the reasons discussed above, and the Court concluding that Petitioner has presented no grounds upon which federal habeas relief is warranted, it is accordingly,

**ORDERED AS FOLLOWS**:

---

[12] Because *Castro* was decided subsequent to the Sixth Circuit's decision in *Murphy v. Ohio*, 263 F.2d 466 (6th Cir. 2001) wherein a different panel of the Sixth Circuit suggested that it was improper for the district court to deny a certificate of appealability before the petitioner had even applied for one, the Court believes that *Castro* is controlling and will proceed to determine which claims in Willoughby's petition, if any, warrant a COA.

(1)     The petition of Mitchell Willoughby for writ of habeas corpus (Doc. # 7) is **denied**;

(2)     The instant action is **dismissed with prejudice** and stricken from the docket of this court;

(3)     This is a final and appealable order.  With regard to any appeal, a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b) will be **issued for Claims 1 and 5(1)(d)**, and **denied for all other Claims raised**.

(4)     Judgment will be entered contemporaneously with this Memorandum Opinion and Order in favor of the Respondent.

This 29th day of August, 2014.

Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\DeathPenalty\Willoughby\MOO denying petition.wpd